**STATE of Utah, Plaintiff and Respondent,**

v.

**Darrel COPELAND, Defendant and Appellant.**

No. 860491.

Supreme Court of Utah.

Dec. 6, 1988.

Robert W. Gutke, Logan, for defendant and appellant.

David L. Wilkinson, Sandra L. Sjogren, Salt Lake City, for plaintiff and respondent.

DURHAM, Justice:

Defendant Darrel Copeland entered a plea of guilty and mentally ill to the charge of sodomy on a child. Prior to sentencing, defendant moved to withdraw his plea on the ground that it had not been entered voluntarily and knowingly. The trial court refused to allow defendant to withdraw his plea and sentenced him to a minimum mandatory term of fifteen years, with a recommendation that he be placed in the Utah State Hospital's in-patient sex offender program. Defendant raises the following issues on appeal: (1) he challenges Utah Code Ann. § 76-5-406.5 (Supp.1988), which denies him probation or suspension of his sentence while granting it to others in similar circumstances; (2) he challenges the constitutionality of Utah Code Ann. § 76-5-403.1 (Supp.1988), the minimum mandatory sentencing scheme, on the grounds that it is cruel and unusual punishment and that it is vague; (3) he claims that the trial court erred by not holding a hearing to determine his mental competency pursuant to Utah Code Ann. § 77-35-21.5 (Supp.1988); and (4) he claims that the trial court failed to properly ascertain whether his plea was voluntarily and knowingly made as required by Utah Code Ann. § 77-35-11 (Supp.1988) and *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). We vacate defendant's sentence and remand to the trial court to determine defendant's mental condition and to inquire into the voluntariness of defendant's guilty plea.

On May 13, 1986, defendant was arrested for sodomizing his seven-year-old niece. Sodomy on a child is a first degree felony and is punishable by imprisonment for a minimum mandatory term of five, ten, or fifteen years or which may be for life. Utah Code Ann. § 76-5-403.1 (Supp.1988). Defense counsel requested that the trial judge order an evaluation of defendant's mental capacity at the state psychiatric hospital pursuant to Utah Code Ann. § 77-14-4 (Supp.1988), and the court ordered the examination. The two doctors who evaluated defendant did not find him to be insane or of diminished capacity, but did find him to be mentally ill due to recurrent episodes of major depression.

After negotiations between the State and defendant, the parties reached an agreement whereby defendant would plead guilty and mentally ill to the charge of sodomy on a child. The State agreed not to bring any additional charges and to make a recommendation to the court concerning defendant's sentence. It is unclear from the record what the State promised to recommend and what it actually recommended. At the arraignment, defense counsel told the court that "the State would concur in a recommendation that [defendant] be committed or sentenced to the Utah State Hospital and placed in a sex offender program in-patient at the Hospital." The presentence report, however, stated that the county attorney recommended that "Mr. Copeland's sentence *includes* [sic] a sex offender treatment at the Utah State Hospital." (Emphasis added.) The presentence report recommended a fifteen-year minimum mandatory sentence at the state prison, with the requirement that defendant participate in a sex offender program before his release.

On July 28, 1986, defendant pleaded guilty and mentally ill to the charge of sodomy on a child. The following exchange occurred:

The Court: State vs. Copeland. Derrell [sic] Ray Copeland; is that your correct name?

Mr. Copeland: Yes.

The Court: Mr. Gutke is your attorney?

Mr. Copeland: Yes.

The Court: And you've received a copy of the information?

Mr. Copeland: Yeah.

The Court: This is an information that alleges a first degree felony of sodomy on a child and alleging that this occurred in Cache County on May 1, 1985, by engaging in a sexual act upon a child under the age of fourteen and involving

the genitals of the actor and the mouth of the child. Have you made a determination of your plea?

Mr. Copeland: Yes.

The Court: And what would that be?

Mr. Gutke: Your Honor, there have been negotiations in this matter.... [T]he negotiations have been that Mr. Copeland will enter a plea of guilty but mentally ill, that plea being pursuant to Section 77–35–21.5 of the Utah Code, and that the state would concur in a recommendation that Mr. Copeland be committed or sentenced to the Utah State Hospital and placed in a sex offenders program in-patient at the hospital; and, in addition, no additional, other, further charges would be filed against Mr. Copeland.

The Court: I would ask then, Mr. Copeland, what is your plea to the information?

Mr. Copeland: Guilty but mentally ill.

The Court: Okay. You understand that this charges you with a first degree felony, which has a minimum mandatory sentence, either the hospital or prison, either one, and that this can be a minimum mandatory of five years, ten years, or fifteen; do you understand that?

Mr. Copeland: Yeah.

The court also informed defendant that a guilty plea has the same effect as a jury verdict of guilty and that the court was not bound by the recommendations of counsel. The court questioned defendant to assure itself that the plea was voluntary and had not been induced by threats or promises and then accepted the plea.

The sentencing hearing was held on August 26, 1986. Prior to sentencing, defendant requested to withdraw his plea pursuant to Utah Code Ann. § 77–13–6 (1982). Defendant's counsel argued that defendant's plea was not voluntarily and knowingly entered because of his mental condition and a misunderstanding concerning the State's recommendation. Counsel argued that his client thought the State would recommend commitment to the Utah State Hospital, not prison. The trial court dismissed the request to withdraw the plea on the ground that the consequences of mandatory sentencing had been explained to defendant and he had been told that the court was not bound by the State's recommendation.

The court found that defendant was not a candidate for probation under Utah Code Ann. § 76–5–406.5 (Supp.1988) because defendant was not "the victim's parent, stepparent, adoptive parent, or legal guardian." After examining the aggravating and mitigating circumstances, the court held that the aggravating circumstances overrode the mitigating circumstances. Based on its findings, the court imposed a fifteen-year minimum mandatory sentence at the Utah State Prison, with a recommendation that prison authorities consider placing defendant in the Utah State Hospital's sex offender program.

I

■ Defendant challenges the constitutionality of Utah Code Ann. § 76–5–406.5 (Supp.1988), which provides:

(1) In a case involving rape of a child, attempted rape of a child, or sodomy upon a child involving the actor's genitals and the mouth or anus of the child, *where the defendant is the victim's parent, stepparent, adoptive parent, or legal guardian* who has lived in the household in the role of a parent to the victim for a continuous period of time of at least one year prior to the earliest offense, and the victim was more than five years of age at the time the earliest offense was alleged or proven, execution of sentence may be suspended and probation may be considered....

(Emphasis added.) Defendant contends that this statute denies him equal protection of the law in violation of the fourteenth amendment to the United States Constitution and article I, section 24 of the Utah Constitution. Defendant claims that limiting probation to the class of persons defined in the statute is discriminatory and therefore unconstitutional.

In *State v. Bishop*, 717 P.2d 261 (Utah 1986), this Court determined that the minimum mandatory sentence provision of the

child sodomy statute does not unconstitutionally discriminate. In that case, as in this one, the class of persons under the scrutiny of the Court consisted of child sodomizers who do not "generally constitute a suspect class entitled either to a heightened or an intermediate level of scrutiny." *Id.* at 266 (footnote omitted). We stated: "Equal protection of the law provisions do not preclude people from being treated differently under the law as long as there is a reasonable basis for the difference." *Id.* Therefore, the question in the instant case is whether the probation statute "bears a reasonable and substantial relation to a legitimate state objective." *State v. Amicone*, 689 P.2d 1341, 1343 (Utah 1984). We hold that it does.

House Bill 209, entitled "Child Kidnaping and Sexual Abuse," significantly changed much of the law dealing with sexual exploitation of children.[1] Representative Hillyard, while introducing the bill to the House, stated:

[T]he primary controversy in this bill has been in the question of an incest exception.... [W]hen this bill was first drafted there was no exception for incest. And in the negotiations and concerns with many of the social workers involved in that area, there have been compromises and agreements made for an exception in the area of incest.

The exception mentioned became the probation provision of Utah Code Ann. § 76–5–406.5 (Supp.1988).

On March 3, 1983, during the discussion of House Bill 209, Representative Richards proposed an amendment to the probation section of the bill which was passed by the legislature. This amendment had the effect of enlarging the class of incest offenders eligible for probation.[2] The debates concerning this amendment illustrate the legislature's rationale for adopting an incest exception. The legislature determined that in incest cases the judge should have discretion to grant probation when appropriate for the child victim, the family, and the offender.

Representative Richards argued that in some instances it is in the best interests of the child victim to place the offender on probation: "[T]he child is the victim, [sic] the child is the one that will bear the scars in the years to come when she was responsible for sending daddy to jail." Representative Pace commented:

[S]tudies have shown that it is not always best for the offended child to have the father taken out of the home.... [T]he [child] ends up ... having feelings of guilt not only because of what has happened to her father, but because of the attitudes that her mother expresses towards her. And in many cases, those feelings can be ameliorated and could be modified if a severe sentence is not imposed upon the father, but the father is given some kind of treatment.

It was also argued that in some circumstances, probation would be appropriate for the preservation of the family. Representatives Richards and Pace expressed concern that removing the incest offender from the home would serve only to break up the family and deprive it of a necessary source of income. The amendment would leave these decisions within the discretion of the judge because, as Representative Pace stated, the legislature did not "know the facts which ought to be related to that decision and which may be destroying homes."

---

1. House Bill 209 is
   [a]n act relating to kidnaping and sexual offenses and other crimes; establishing new provisions to curb child kidnaping, rape of a child, object rape of a child, sodomy upon a child, and sexual abuse of a child, and to curb certain offenses against adults such as aggravated sexual assault, aggravated kidnaping, rape, and forcible sexual abuse.
   Child Kidnaping and Sexual Abuse Act, 1983 Utah Laws ch. 88, at 404 (preamble to House Bill 209).

2. The amendment extended the possibility of probation to incest offenders whose victims were six or seven years old by allowing probation opportunities to defendants who had abused children more than five years old. The statutory provision had previously been limited to defendants who had abused children who were at least eight years old.

The legislative debates demonstrate heightened concern for cases where the offender is a parent or guardian. Representative Richards noted that the statute was designed to give judges the discretion to allow an offender "to mend his ways, provide a living for his family, take care of them, and still have an opportunity to come back into the home." There is no indication in the legislative history of the bill that the legislature considered these kinds of sex offenders likely to be "cured," as suggested by the State in this case.[3] Rather, it apparently considered these offenders unique because of their special relationship with the family and the victim.

In light of the legislature's expressed concerns, we must conclude that a rational basis exists for the statute. The state has an interest in preserving the family unit and protecting the child victim, and the statute bears a substantial relationship to that interest.

## II

■ Defendant's next two claims challenge the constitutionality of the minimum mandatory sentencing scheme in Utah Code Ann. § 76-5-403.1 (Supp.1988) on the grounds that it is cruel and unusual punishment and vague. These two issues have been resolved in favor of the State in *State v. Bishop*, 717 P.2d 261, 268–72 (Utah 1986) (deciding the issue of cruel and unusual punishment), and *State v. Egbert*, 748 P.2d 558 (Utah 1987) (deciding the issue of vagueness).

Defendant also appears to argue that the statute constitutes cruel and unusual punishment as applied to him. In *State v. Hanson*, 627 P.2d 53 (Utah 1981), this Court reiterated that the standard for analysis of such claims is " 'whether the sentence imposed in proportion to the offense committed is such as to shock the moral sense of all reasonable men as to

what is right and proper under the circumstances.' " *Id.* at 56 (quoting *State v. Nance*, 20 Utah 2d 372, 375, 438 P.2d 542, 544 (1968)).

We do not believe that the imposition of a fifteen-year minimum mandatory sentence is cruel and unusual punishment as applied to defendant. He admits sexually abusing his niece on several occasions over an extended period of time and while in a position of trust to the victim. Under these circumstances, his sentence does not "shock the moral sense"; it simply reflects the severity of the crime.

## III

■ Next, defendant argues that the trial court erred by sentencing him to the Utah State Prison without adhering to the procedures set forth in Utah Code Ann. § 77-35-21.5(3) and (4) (Supp.1988). Subsection (3) requires, "If the defendant is found guilty and mentally ill, the court shall impose any sentence which could be imposed under law upon a defendant who is convicted of the same offense. Before sentencing, the court *shall* conduct a hearing to determine the defendant's present mental state." (Emphasis added.) Subsection (4) states:

The court shall in its sentence order hospitalization at the Utah State Hospital or other suitable facility if, upon completion of the hearing and consideration of the record, the court finds by clear and convincing evidence that:

(a) the defendant has a mental illness as defined by Subsection 76-2-305(4);

(b) because of his mental illness the defendant poses an immediate physical danger to others or self, which may include jeopardizing his own or others' safety, health, or welfare if placed in a correctional or probation setting, or lacks the ability to provide the basic necessities

---

**3.** In its brief and at oral argument, the State has focused on distinctions between "regressed" and "fixated" offenders, arguing that incest offenders tend to be in the former category. The legislative history, however, does not make any mention of these distinctions, and consequently, they do not appear to have been a basis for the statute. Moreover, had the legislative history shown the regressed/fixated distinctions to be the basis for the statute, it would be vulnerable to the argument that the classification is both under- and overinclusive and therefore unconstitutional.

of life, such as food, clothing, and shelter, if placed on probation;

(c) the defendant lacks the ability to engage in a rational decision-making process regarding the acceptance of mental treatment as demonstrated by evidence of inability to weigh the possible costs and benefits of treatment;

(d) there is no appropriate treatment alternative to a court order of hospitalization; and

(e) the Utah State Hospital or other suitable facility can provide the defendant with treatment, care, and custody that is adequate and appropriate to the defendant's conditions and needs.

These provisions require the trial court to hold a hearing to determine the defendant's mental state prior to sentencing and to sentence according to the criteria set forth in subsection (4). If all the requirements are met, the defendant should be sentenced to the state hospital.

In *State v. DePlonty*, 749 P.2d 621 (Utah 1987), we affirmed the clear language of Utah Code Ann. § 77–35–21.5(3) and (4). In *DePlonty*, we held that the trial judge erred by refusing to find the defendant mentally ill when all evidence was to the contrary. *Id.* at 627. On remand, we instructed the trial court to hold the required hearing and sentence the defendant based on the criteria set out in section 77–35–21.-5(4). *Id.* Unlike the court in *DePlonty*, the trial court in the instant case found defendant mentally ill. It did not, however, hold the sentencing hearing required by the statute. We therefore remand this case for the required hearing.

The criteria set forth in section 77–35–21.5(4) to determine whether a defendant should be committed to the state hospital after a judgment of guilty and mentally ill appear to have been taken directly from the involuntary commitment statute, Utah Code Ann. § 64–7–36(10) (1986). It is odd that the legislature chose to incorporate this set of criteria into the guilty and mentally ill statute. The policy considerations

associated with commitment to a mental institution change dramatically when the issue is not whether to commit an individual involuntarily, but rather whether to permit a criminal defendant to be hospitalized instead of imprisoned. With reference to involuntary commitment, the statutory criteria serve to protect the individual from involuntary confinement unless the interests of the state outweigh the individual's right to liberty.[4] In the criminal commitment statute, the criteria must serve to balance the defendant's right to treatment against society's right to protection against a potentially dangerous individual. The defendant's right to liberty is not in issue because he will be confined, either in the hospital or in prison. In this situation, hospitalization is desirable from the convicted individual's perspective, whereas in involuntary civil commitment cases, the individual's preferred choice is nonhospitalization. Thus, the commitment criteria serve different purposes in each statute, and it is illogical to have used the same criteria in both.

Because the criteria serve a wholly different function in the guilty and mentally ill statute than they serve in the involuntary civil commitment statute, some of the criteria now contained in section 77–35–21.-5(4) are irrelevant to an evaluation of whether a defendant should be hospitalized instead of imprisoned. We believe that subsections (c) and (d) of section 77–35–21.-5(4) are not rationally related to the sentencing process as opposed to civil commitment.

The theory behind subsection (c) is that of *parens patriae:*

Since ... *parens patriae* is premised on the need for the state to act to protect the well-being of its citizens when they cannot care for themselves, the imposition of involuntary commitment would seem necessary to vindicate that interest only when an individual is incapable of making his own evaluation of his need for psychiatric treatment. By contrast,

4. *See generally Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1190 (1974).

compulsory hospitalization of persons with the mental capacity to determine the desirability of obtaining care in accordance with their personal values would interfere with individual autonomy and physical liberty without any assurance that the state, as a substitute decisionmaker, would better ascertain the best interest of the individual.

*Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1190, 1213–14 (1974) (footnotes omitted). Because under the guilty and mentally ill statute the defendant will be confined in any event, either to the state hospital or to the prison, the requirement that he be incapable of making his own decisions about treatment before he can be hospitalized is nonsensical. In these circumstances, the defendant's liberty interest has already been curtailed because of his criminal conviction. The interest at stake in sentencing deliberations is his right to treatment, not his right to be free. There is no justification for depriving a defendant of his right to treatment merely because he has the capacity to decide whether care is desirable.

Subsection (d) embodies the theory of the "least restrictive alternative doctrine." Again, this theory is concerned with the liberty of the individual. It "prevent[s] the state from requiring hospitalization if a less burdensome disposition would be equally effective at protecting society from a dangerous mentally ill person." *Id.* at 1249 (footnote omitted).

We consider also the requirement found in subsection (e). This subsection recognizes that the state cannot justify depriving an individual of his liberty by involuntary hospitalization unless he will receive the treatment he needs in that setting. *See id.* at 1316–33. The doctrine of *parens patriae* justifies placing an individual in the hospital because it is in his best interest. If the individual does not receive treatment, the justification disappears and the deprivation of the individual's liberty becomes unwarranted. *Id.* at 1326–27. The same policy considerations do not apply to hospitalizations pursuant to the guilty and mentally ill statute, since hospitalization

may represent a less drastic invasion of a personal liberty interest than prison and since little or no treatment is available in prison. A countervailing policy consideration exists with reference to subsection (e), however, that is not present *vis-a-vis* subsections (c) and (d) and that may have relevance for the criminal commitment process. If neither the hospital nor any other facility can provide "treatment, care, and custody that is adequate and appropriate to the defendant's conditions and needs," placement in such a facility may not be justified because of the additional security burdens it would impose. A defendant whose mental condition is virtually and conclusively untreatable would not necessarily be appropriately housed in a treatment facility. Thus, a finding that treatment is available is relevant to a decision to commit a criminal defendant under section 77–35–21.5(4).

The means employed in subsections (c) and (d) of section 77–35–21.5(4), however, are unintelligible in the context of the statute's purposes. The legislature's intent in section 77–35–21.5 is to provide for treatment, as opposed to imprisonment, of the mentally ill offender. Not one of the considerations in subsections (c) and (d) is relevant to the treatment rationale. The application of those provisions to a mentally ill criminal defendant is thus arbitrary and capricious, in violation of the due process guarantee of article I, section VII of the Utah Constitution. We therefore strike subsections (c) and (d) of section 77–35–21.5(4) as unconstitutional.

On remand in this case, the trial court should hold the required sentencing hearing. In evaluating whether defendant should be placed into the state hospital, only subsections (a), (b), and (e) of section 77–35–21.5(4) should be used by the trial court to make its determination.

### IV

█ Defendant's final claim is that the trial court failed to properly ascertain whether his plea was voluntarily and knowingly made, as required by Utah Code Ann. § 77–35–11 (Supp.1988) and *Boykin v. Ala-*

*bama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). The crux of defendant's argument is that the trial court failed to adequately explain the "nature and elements of the offense." Utah Code Ann. § 77–35–11(e)(4) (Supp.1988).

In *McCarthy v. United States,* 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), the United States Supreme Court stated: "[B]ecause a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *Id.* at 466, 89 S.Ct. at 1171 (footnote omitted). The importance of this requirement was demonstrated in *State v. Breckenridge,* 688 P.2d 440 (Utah 1983). In *Breckenridge,* the defendant pleaded guilty to the charge of arson. This Court determined on appeal that the defendant had not understood the nature and elements of the charge of arson because neither his confession nor his account of the event at the arraignment suggested that he had intentionally damaged the building. *Id.* at 443. Because intent is a necessary element of the crime of arson,[5] we determined that the plea was not knowingly and voluntarily entered. *Id.* at 444.

In the instant case, we look to the statute and the record to determine the adequacy of the trial court's explanation regarding the nature and elements of the offense. There are two elements to the crime of child sodomy: (1) that the child be under the age of 14, and (2) that the act involve the "genitals or anus of the actor or the child and the mouth or anus of either person." Utah Code Ann. § 76–5–403.1 (Supp.1988). At defendant's arraignment, the trial judge explained that the charge was "a first degree felony of sodomy on a child ... alleging that this occurred in Cache County on May 1, 1985, by engaging in a sexual act upon a child under the age

of fourteen and involving the genitals of the actor and the mouth of the child." This explanation not only states the elements of the crime, but also describes the specific act of defendant and his niece, as set forth by defendant in a taped confession available to the trial judge at the plea hearing. Unlike *Breckenridge,* nothing in the record suggests that defendant misunderstood either the elements of the crime or his acts that constituted the offense.

■ The United States Supreme Court has said, "[T]here is no adequate substitute for demonstrating *in the record at the time the plea is entered* the defendant's understanding of the nature of the charge against him." *McCarthy,* 394 U.S. at 470, 89 S.Ct. at 1173 (emphasis in the original). We think the most effective way to do this is to have a defendant state in his own words his understanding of the offense and the actions which make him guilty of the offense. By this statement, the trial court can assure itself that the defendant is truly submitting a voluntary and knowing plea. Moreover, the record on appeal will clearly reflect the defendant's understanding.[6] Although this method is therefore preferable to others, it is not absolutely required. The test is voluntariness. We hold that this record demonstrates that defendant admitted acts sufficient to justify his conviction of the offense to which he pleaded guilty.

## V

■ The final issue before us concerns the voluntariness of defendant's plea. Utah Code Ann. § 77–35–11(e)(2) (Supp. 1988) prohibits the trial judge from accepting a plea which is not voluntarily entered into. At his sentencing hearing, defendant requested to withdraw his plea because he claimed to have misunderstood the nature

---

**5.** Utah Code Ann. § 76–6–102 (1978) states in pertinent part:

    (1) A person is guilty of arson if ... he unlawfully and intentionally damages:

    ....

    (b) The property of another.

**6.** This method is not foolproof, of course, as *State v. Breckenridge,* 688 P.2d 440 (Utah 1983),

demonstrates. There, the defendant explained in his own words what he had done. The judge, however, failed to note that the actions the defendant described did not satisfy the elements of the crime. Because the record was complete, however, this Court was able to correct the error on appeal. Thus, we think that this method of examination is the most effective.

of the State's promise to recommend a certain sentence and, therefore, to have misunderstood the possible sentences available for his offense. The trial court refused to allow defendant to withdraw his plea.

There are several problems with the plea bargain entered into by defendant. First, it appears either that he misunderstood the promise the State made to him regarding its sentencing recommendation or that the promise was illusory. Second, and more serious, is the claim that defendant's understanding of the promise caused him to be misled about the sentencing options available to the court and therefore the value of the bargain into which he was entering.

In *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 742 (1970), the United States Supreme Court held:

> "[A] plea of guilty entered by one *fully aware of* the direct consequences, *including the actual value of any commitments made to him by the court, prosecutor,* or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)."

*Id.* at 755, 90 S.Ct. at 1472 (quoting *Shelton v. United States,* 246 F.2d 571, 572 n. 2 (5th Cir.1957), *rev'd on other grounds,* 356 U.S. 26, 78 S.Ct. 563, 2 L.Ed.2d 579 (1958)) (emphasis added). The Fourth Circuit Court of Appeals followed the *Brady* analysis in *Hammond v. United States,* 528 F.2d 15 (4th Cir.1975). In *Hammond,* the defendant was told that he might receive a prison sentence of 90 years. In fact, the maximum sentence possible was a term of 55 years. Defendant pleaded guilty so as to receive no more than a 25–year sentence. The Fourth Circuit held that this misinformation vitiated the voluntariness of the plea because the benefit of the defendant's bargain had been grossly exaggerated. The defendant was therefore not aware of the true value of the

state's commitments. *Id.* at 19. *Brady* and *Hammond* require that in order for a plea to be voluntarily and knowingly made, the defendant must understand the nature and value of any promises made to him.

It is not clear in this case what recommendation the State promised to make. According to defense counsel, the State was to "concur in a recommendation that Mr. Copeland be *committed or sentenced to the Utah State Hospital* and placed in a sex offenders program in-patient at the hospital." Counsel for the State raised no objection to this statement, creating the inference that it was correct. However, the presentence report, at page two, states, "[T]he County Attorney's Office recommends to the court Mr. Copeland's sentence *includes* [sic] a sex offender treatment at the Utah State Hospital, Provo, Utah." (Emphasis added.) The report suggests that the State in fact did not promise to recommend commitment to the hospital, but merely hospital treatment while serving his prison sentence. In light of these conflicts within the record, it is possible that defendant was genuinely and legitimately confused about the recommendation promised and therefore about its implications for possible sentences.

If the State promised to recommend commitment to the hospital or if defendant understood this to be the promise, that promise was illusory. A promise to recommend a certain sentence includes the assumption that the trial judge has the power to adopt the recommended sentence. In reality, however, Utah Code Ann. § 77–35–21.5 (Supp.1988) gives the trial judge little discretion. The statute contains a specific objective test to determine whether a defendant is to be sentenced to the hospital or to the prison.[7] Under this statute, the trial judge may sentence a defendant to the state hospital if, and only if, the required criteria are found. When any condition is missing and when, as here, the offense carries a minimum mandatory sentence without possibility of probation, the judge has no other choice but to sentence the defendant to prison. Conse-

---

7. See *supra* section III, at 1270, for the text of

Utah Code Ann. § 77–35–21.5(4) (Supp.1988).

quently, the judge's role is to determine whether the required criteria are present and to sentence accordingly.[8] A recommendation from the State can have no effect on the judge's decision. Therefore, a promise to make such a recommendation would be illusory and misleading.

The Michigan Court of Appeals has examined similar illusory promises. In *People v. Lawson,* 75 Mich.App. 726, 255 N.W. 2d 748 (1977) (per curiam), the defendant pleaded guilty to two crimes after the state promised not to request consecutive sentences. Under the law of the jurisdiction, the defendant could not have been sentenced to consecutive terms, and thus he derived no benefit from the state's promise. The court, relying on *Hammond,* held, "[D]efendant pled with an exaggerated belief in the benefits of his plea," *id.,* 255 N.W.2d at 750, and "[s]ince defendant surrendered his right to trial in apparent misapprehension of the value of commitments made to him, he should be allowed to withdraw his plea." *Id.* We find the reasoning in *Lawson* to be logical and in keeping with Utah's statutory requirement that a defendant's plea be entered voluntarily. Utah Code Ann. § 77–35–11(e)(2) (Supp. 1988). We therefore adopt Michigan's reasoning.

The record suggests the possibility that defendant did not understand the value of the commitments made to him. If the State promised to recommend hospitalization rather than a prison sentence or if defendant understood this to be the promise, then he "pled with an exaggerated belief in the benefits of his plea," and he should be allowed to withdraw his plea. It appears that defendant desires treatment for his condition. The enhanced prospect of immediate treatment in a hospital-based sex offender program, as opposed to placement in the prison without treatment, would likely have been a strong induce-

ment to defendant to plead guilty. Moreover, defendant's belief that hospitalization instead of prison was a likely option was enhanced by the trial judge's statement at sentencing that the charge "has a minimum mandatory sentence, either the hospital or prison, either one...." No mention of statutory criteria for hospitalization was made by the judge, the prosecutor, or defense counsel.

Finally, we address the fact that the State may not have fulfilled the promise it made to defendant. The trial judge suggested at the sentencing hearing that even if the State did not keep its promise to recommend a sentence, defendant would not be allowed to withdraw his plea because he was informed at the arraignment of the consequences of the crime and that the recommendations were not binding on the court. We have difficulty with the court's suggestion that the State's failure to keep its promise would be of no consequence.

It is well established that a prosecutor may not make promises which induce a guilty plea and then refuse to keep those promises. "[A] constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). In *Santobello,* the prosecutor promised not to make any recommendations concerning the defendant's sentence in return for the defendant's guilty plea to a lesser offense than he had been charged with. *Id.* at 258, 92 S.Ct. at 497. That promise was not kept. The United States Supreme Court reversed and remanded the case even though the recommendation had not influenced the trial judge.

---

**8.** *See State v. DePlonty,* 749 P.2d 621 (Utah 1987) (reiterating the procedural requirements of Utah Code Ann. § 77–35–21.5 (Supp.1988)). It would appear from the record that the trial court, like the court in *DePlonty,* was under a misconception that the Board of Pardons has discretion to order immediate treatment for sex

offenders. In fact, a sex offender who is sentenced to prison will not receive treatment until three years prior to his release. *See State v. Bishop,* 717 P.2d 261, 267 (Utah 1986). Consequently, defendant will not begin to receive treatment for twelve years if sentenced to the Utah State Prison.

Utah has followed the *Santobello* precedent. In *State v. Garfield*, 552 P.2d 129 (Utah 1976), the prosecutor promised to recommend probation to the sentencing judge. On appeal, the defendant claimed that the State had not fulfilled its promise. This Court remanded the case for an evidentiary hearing to determine whether the recommendation had been included in the probation report. We held that if it had not been included, the defendant was "entitled to have his sentence set aside and to be resentenced with the benefit of his bargain." *Id.* at 130.

In *State v. Kay*, 717 P.2d 1294 (Utah 1986), this Court, examining the possible double jeopardy implications of a broken plea agreement, stated:

> If the ... prosecutor refuses to comply with the terms of the plea [after it is entered and accepted], the defendant may choose to withdraw the plea.... [O]nce the court or prosecution has entered into a plea agreement and that plea has been accepted and entered, neither one may unilaterally withdraw from the agreement without a showing that facts analogous to those warranting a mistrial exist (at least in the absence of a breach of the agreement by the defendant).

*Id.* at 1304. In light of *Santobello*, our holding in *Garfield*, and the discussion of guilty pleas in *Kay*, defendant must be allowed to withdraw his plea if the State made a promise it did not or could not fulfill.

We vacate the sentence and remand to the trial court for a hearing to determine defendant's claim of mental illness requiring hospitalization and for additional findings of fact regarding defendant's plea. The trial court should determine the exact recommendation promised by the State, defendant's understanding of that promise, and whether the State fulfilled its promise. If it is found as a matter of fact either that the State promised to recommend commitment to the Utah State Hospital or that defendant understood this to be the promise without knowing that it was without value or that the State did not fulfill its promise, defendant should be allowed to withdraw his plea.

HOWE, Associate C.J., and STEWART and ZIMMERMAN, JJ., concur.

HALL, Chief Justice (concurring and dissenting):

I concur in remanding this case for a determination of defendant's mental condition. However, I am not persuaded that defendant's plea of guilty was other than knowing and voluntary.