**The MEAD CORPORATION, dba Zellerbach, a Mead Company, Plaintiff and Appellant,**

v.

**DIXON PAPER COMPANY and Donald William Johnson, Defendants and Appellee.**

No. 940256–CA.

Court of Appeals of Utah.

Nov. 22, 1995.

---

Charles W. Hanna and Douglas R. Short, Salt Lake City, for Appellant.

Elwood P. Powell, Salt Lake City, for Appellee Johnson.

Before ORME, GREENWOOD and WILKINS, JJ.

## OPINION

GREENWOOD, Judge:

The Mead Corporation, dba Zellerbach (Mead), appeals the trial court's grant of summary judgment in favor of Donald William Johnson (Johnson). The ruling gave Johnson priority over Mead with regard to the accounts receivable and inventory of a common debtor, Graphics Reproductions (Graphics). We reverse.

## BACKGROUND

This case concerns several loan transactions involving Graphics. On August 24, 1989, West One Bank (West One) extended a $50,000 revolving line of credit to Graphics. The line of credit was secured by a $100,000 letter of credit from Wells Fargo Bank and by Graphics's inventory and accounts receivable.

On that same date, West One loaned $100,000 to Graphics, evidenced by a promissory note. The $100,000 loan was secured by the same letter of credit from Wells Fargo. West One filed a UCC-1 financing statement with the State of Utah to perfect its security interest in Graphics's inventory and receivables. *See* Utah Code Ann. § 70A-9-401 et seq. (1990). The Security Agreement executed in connection with the $50,000 line of credit contains a so-called "dragnet" clause, which states that the collateral secures "all Debtor's present and future debts, obligations and liabilities of whatever nature to Bank."

Wells Fargo issued a letter of credit in favor of West One, at the request of its customer, the Jack T. Baillie and Francis B. Baillie Trust (the Trust). The Trust agreed to pay Wells Fargo if the letter of credit was drawn upon, and Johnson, in turn, agreed to reimburse the Trust. Johnson, who was a beneficiary of the Trust, was unsecured.

Graphics later approached Mead to obtain further financing. On April 4, 1991, Mead inquired about the extent of Graphics's debt to West One. West One Assistant Vice President Randal Roberts informed Mead in writing that Graphics "has a $50,000 revolving line with our bank. The balance, at the end of banking on 4/3/91, was $15,000. This is secured by accounts and inventory." Roberts did not mention the $100,000 outstanding loan or indicate that the inventory and accounts receivable was pledged as collateral for any debt of Graphics other than the $50,000 line of credit. Mead subsequently extended credit to Graphics, also secured by Graphics's inventory and accounts receivable. Mead claims it relied on the representation that Graphics's maximum debt secured by the inventory and accounts receivable was $50,000 when it agreed to extend credit to Graphics.

On August 8, 1989, after default by Graphics, West One drew on the letter of credit from Wells Fargo and received net proceeds of $99,864. Four days later, on August 12, 1991, Johnson reimbursed Wells Fargo for the drawn-upon letter of credit. On about August 27, 1991, Johnson paid West One $1,700, the outstanding unpaid balance on the $50,000 revolving credit line note. West One then assigned its interest in the $50,000 note and the West One security agreement to Johnson.

Mead filed suit against Johnson and Dixon Paper Company to determine the priorities of the parties' interests in the inventory and accounts receivable. Johnson counterclaimed against Mead and cross-claimed against Dixon Paper, claiming first priority. The trial court granted Johnson's motion for summary judgment, holding that Johnson was entitled to equitable subrogation to West One's position and therefore Johnson had a first priority lien on the inventory and accounts receivable, that Dixon Paper had a second priority lien and that Mead had a third priority lien. By stipulation, all claims involving Dixon Paper were paid from the available funds and dismissed.

Mead appeals from the summary judgment in favor of Johnson.

## ISSUES ON APPEAL

We consider two issues on appeal:

(1) Did West One's security interest in the accounts receivable extend to secure the $100,000 note?

(2) If West One's security interest did secure the $100,000 note, does Johnson succeed to its interest in the collateral by virtue of the doctrine of equitable subrogation?

## STANDARD OF REVIEW

■ In reviewing a grant of summary judgment, we view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party and will affirm only if the moving party is entitled to judgment as a matter of law. *Dansie v. Anderson Lumber Co.*, 878 P.2d 1155, 1156 (Utah App.1994).

## ANALYSIS

### Effect of Dragnet Clause

■ Mead argues West One had no security interest in the inventory and accounts receivable to which Johnson could be subrogated. Mead claims that the so-called "dragnet" provision [1] contained in the security agreement and the UCC–1 financing statement, negotiated in connection with the $50,000 line of credit, was limited to the $50,000 line of credit and was not intended to apply to the $100,000 note. We disagree.

---

1. A dragnet clause is a "[p]rovision in a mortgage in which mortgagor gives security for past and future advances as well as present indebtedness." *Black's Law Dictionary* 342 (6th ed. 1990).

In construing a dragnet clause, we first attempt to determine the actual intent of the parties from the contractual documents and the attendant circumstances. *Heath Tecna Corp. v. Zions First Nat'l Bank,* 609 P.2d 1334, 1337 (Utah 1980); *First Sec. Bank of Utah v. Shiew,* 609 P.2d 952, 956–57 (Utah 1980); *see also North Park Bank of Commerce v. Nichols,* 645 P.2d 620, 622 (Utah 1982) (finding clear and unmistakable language of guarantor's written promise to secure present and future obligations in absence of contrary evidence establishes parties' intent). Moreover, "a dragnet type clause will not be extended to cover future advances unless the advances are of the same kind and quality or relate to the same transaction or series of transactions as the principal obligation secured." *Heath Tecna,* 609 P.2d at 1337 (citations omitted).

In this case, the $50,000 line of credit and the $100,000 loan involved the same parties and were negotiated on the same day—August 24, 1989. The security agreement executed by Graphics in favor of West One in connection with the $50,000 line of credit was explicitly secured by Graphics's inventory and accounts receivable. Additionally, the agreement states that the described collateral is intended to "secure all of Debtor's present and future debts, obligations and liabilities of whatever nature to the bank ... including loans made pursuant to this Agreement and the Debtor's obligations hereunder." In addition, the UCC–1 financing statement executed by West One and Graphics and filed with the State provides:

All of [Graphics's] inventory now owned or hereafter acquired and all of Debtor's rights of payment of money now owned or hereafter owed to [Graphics], whether due or to become due and whether or not limited to accounts, contract rights, chattel paper, instruments, and general intangibles, all of which are hereafter called "receivables," together with all substitutions, renewals and accumulations thereto, and, in each and every case, all proceeds of sale received therefrom or funds paid pursuant to the ownership thereof *to secure all [Graphics's] present and future obli-*

*gations of whatever nature* to [West One], including all costs, fees and Interest. (emphasis added.)

The unambiguous language of these documents demonstrates an intention that Graphics's inventory and accounts receivable secure both the $50,000 line of credit and the $100,000 loan. The fact that both transactions were completed on the same day by the same parties strongly suggests they were related transactions. Moreover, the language in the dragnet clause stating that the collateral is intended to secure present or future debts *"including* loans made pursuant to this Agreement" indicates that the parties knew there were *other* loans secured by the inventory and accounts receivable. (emphasis added.) Finally, the financing statement filed by West One also states unequivocally that the inventory and receivables "secure all of the debtors *present and future* obligations of whatever nature." (emphasis added.)

Thus, the $50,000 line of credit and the $100,000 loan "relate to the same transaction or series of transactions." *Heath Tecna,* 609 P.2d at 1337. Therefore, we conclude that the clear language of the documents and the nature of the transactions involved establish the validity of the dragnet clause. Thus, West One had a perfected security interest in the collateral which secured the $100,000 loan.

### Equitable Subrogation

Johnson further asserts that he is entitled to succeed to West One's rights in the collateral by virtue of the doctrine of equitable subrogation. Subrogation is an equitable remedy, intended to prevent injustice and to force payment of a debt by " 'one who in justice, equity, and good conscience ought to pay it.' " *Valley Bank & Trust Co. v. Rite Way Concrete Forming, Inc.,* 742 P.2d 105, 108 (Utah App.1987) *cert. denied,* 765 P.2d 1277 (Utah 1988) (citation omitted).

Under Utah law, "a guarantor, upon payment of the guaranteed obligation, has a right of subrogation to any collateral pledged as security." *Id.* Johnson argues that guarantors and issuers of standby letters of credit are, for practical purposes, identical, and therefore an issuer of a drawn-upon letter of credit is entitled to the same equitable subro-

gation rights as a guarantor.[2] Johnson further asserts that he is entitled to the issuer's subrogation rights because he reimbursed the issuer, Wells Fargo. We assume, for purposes of the following discussion, that Johnson is correct, and therefore confine our discussion to whether the letter of credit issuer, Wells Fargo, is entitled to equitable subrogation to the rights of the beneficiary, West One.

There is a division of authority on the issue of whether the doctrine of equitable subrogation should apply to letters of credit. The "majority" position is that subrogation is not allowed, while the "minority" position is that subrogation is allowed. Because of the split of authority and the sometimes confusing nature of the arguments, a brief review of both positions is in order.

There are essentially four arguments advanced for, or against, allowing an issuer of a letter of credit subrogation to another's priority position. The first argument focuses on whether a letter of credit creates a true secondary obligation, as does a guaranty. Even if a letter of credit does create a primary, rather than secondary, obligation, there is debate over whether this distinction is significant in the context of equitable subrogation. Second, portions of the Uniform Commercial Code (UCC) have been interpreted as supporting both positions. Third, the equities of the case may be balanced. Finally, policy considerations regarding the purpose and function of letters of credit are considered. An excellent discussion of these positions, and the authority for each, is contained in *Tudor Development Group Inc. v. United States Fidelity & Guaranty Co.*, 968

F.2d 357 (3d Cir.1992). The following analysis tracks that applied by the *Tudor* court.

### a. Primary v. Secondary Obligation

The majority position is that a letter of credit is not like a guaranty, because it creates a primary, rather than secondary, obligation, and it is therefore not subject to the doctrine of equitable subrogation. The distinction stems from the important role the "independence principle" plays in the function of a letter of credit.[3] Because of the structure of the letter of credit transaction, the obligation created by the letter is entirely independent from the obligations of the parties to the original transaction. Further, because the letter of credit obligation is separate from the underlying transaction, the defenses available against the beneficiary of the letter are not available to the issuer of the letter of credit.[4] Therefore, the beneficiary of the letter is protected, and "should disagreement arise between customer and beneficiary, the dispute is resolved with the money already in the pocket of the beneficiary." *Tudor*, 968 F.2d at 360. In this way, letters of credit serve the important purpose of creating certainty for the beneficiary, which allows some transactions which would not otherwise occur to proceed.[5]

Because the obligation under a letter of credit is "independent" from the underlying transaction, and is not subject to defenses that would be available to the parties to the underlying transaction, it is sometimes said to be a "primary," rather than a "secondary" obligation. It is the "secondary" nature of a guaranty, however, which has been the justification for the application of the doctrine of

---

**2.** The issuer could claim subrogation to the account party's rights against the beneficiary, the beneficiary's rights against the account party, or the account party's rights against a third party. *See* John F. Dolan, *The Law of Letters of Credit*, § 7.05 (2d ed. 1991). The importance of these distinctions is unclear, but the court in *Tudor Development Group, Inc. v. United States Fidelity & Guaranty Co.*, 968 F.2d 357, 362 n. 3 (3d Cir.1992), noted, "the substitution of the customer for the beneficiary does not require a different analysis or result."

**3.** "The independence principle has been referred to as 'the cornerstone of the commercial vitality of letters of credit.'" *In re East Texas Steel*

*Facilities, Inc.*, 117 B.R. 235, 239 (Bankr. N.D.Tex.1990) (citations omitted).

**4.** "Guarantors [however] may generally assert defenses available to the party whose obligation is guaranteed." *Tudor*, 968 F.2d at 368 (Becker, J., dissenting).

**5.** "In large part due to the independence principle, letters of credit provide a relatively inexpensive and reliable mechanism to assure the beneficiary of prompt payment if there is compliance with specified documentary conditions." Michael Avidon, *Subrogation in the Letter of Credit Context*, 56 Brook.L.Rev. 129, 130 (1990).

equitable subrogation. Therefore, the argument goes, because a letter of credit is not a secondary obligation, equitable subrogation cannot apply in the letter of credit context. In this regard, the *Tudor* court argued

> the key distinction between letters of credit and guarantees is that the issuer's obligation under a letter of credit is primary whereas a guarantor's obligation is secondary—the guarantor is *only* obligated to pay if the principal defaults on the debt the principal owes. In contrast, while the issuing bank in the letter of credit situation may be secondarily liable in a temporal sense, since its obligation to pay does not arise until after its customer fails to satisfy some obligation, *it is satisfying its own absolute and primary obligation to make payment rather than satisfying an obligation of its customer.*

*Tudor,* 968 F.2d at 362 (emphasis added). *See also In re Carley Capital Group,* 119 B.R. 646, 648 (W.D.Wis.1990); *In re Agrownautics, Inc.,* 125 B.R. 350, 352–53 (Bankr. D.Conn.1991); *In re East Texas Steel Facilities, Inc.,* 117 B.R. 235, 241 (Bankr.N.D.Tex. 1990). The Tenth Circuit has acknowledged this difference, albeit in the context of litigation over the enforcement of certain letters of credit. *Federal Deposit Ins. Corp. v. Liberty Nat'l Bank & Trust Co.,* 806 F.2d 961, 968–69 (10th Cir.1986) (noting that the standby letter of credit is a "hybrid," having some characteristics of a guaranty but creating a "primary" obligation); *Philadelphia Gear Corp. v. Federal Deposit Ins. Corp.,* 751 F.2d 1131, 1136–37 (10th Cir.1984) *rev'd on other grounds sub nom. Federal Deposit Ins. Corp. v. Philadelphia Gear Corp.,* 476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986) (acknowledging that a standby letter of credit is "similar in many respects" to a guaranty, but finding it creates a "primary" obligation).

The minority position acknowledges the differences between a guaranty and a letter of credit, but argues that the distinction between "primary" and "secondary" liability is one of semantics, and is irrelevant to the considerations underlying the application of the doctrine of equitable subrogation.[6] Judge Becker's dissent in *Tudor* summarizes this analysis. In short, Judge Becker thought that "the relevant question is whether [the party seeking subrogation] was 'secondarily' liable in the sense that it *paid the debt of another.*" [7] *Tudor,* 968 F.2d at 365 (Becker, J., dissenting) (emphasis added).

By way of explanation, Judge Becker argued that:

> [w]hen a standby credit supporting a loan is honored, the issuer admittedly is satisfying its obligation as a primary obligor to honor the standby credit, but at the same time it is in fact satisfying a debt *for which a person other than the issuer is primarily liable* . . . .

> [T]he notion that an issuer's obligation to honor the letter of credit is a "primary obligation" should be interpreted to mean that, under the independence principle, the issuer may not avoid its obligation to honor the credit by identifying deficiencies in underlying contracts or by otherwise asserting defenses that are typically available to parties who are generally considered to be "secondarily liable" such as guarantors and sureties. Thus . . . the "primary obligation" language in the letter of credit context concerns itself with the issuer's ability to avoid honoring its letter of credit, whereas the "primary liability" language in the subrogation context concerns itself with whether the entity, after reducing a claim of a creditor, received the consideration from the creditor.

---

**6.** The distinction between primary and secondary obligations as created by a guaranty has been acknowledged by this court in another context. In *Mooney v. GR & Associates,* 746 P.2d 1174 (Utah App.1987), the court noted "that a guarantor is only *secondarily liable* for the obligation he has guaranteed and, therefore, has defenses available to him that a primary obligor does not have." *Id.* at 1176 n. 2 (emphasis added).

**7.** This position finds support from White and Summers, who note that "the standby letter of credit acts as a 'back up' against applicant default on obligations of all kinds, both monetary and non-monetary. Standby letters function somewhat like guaranties, for it is applicant's failing that prompts beneficiary's call on the letter." James J. White & Robert S. Summers, *Uniform Commercial Code,* § 26–1(b), p. 108 (4th ed. 1995).

*Tudor,* 968 F.2d at 365–66 (Becker, J., dissenting) (quoting *In re Valley Vue Joint Venture,* 123 B.R. 199, 204, 206 (Bankr. E.D.Va.1991)) (emphasis added); *see also* White & Summers, *supra* note 7, § 26–15, at 213 (agreeing with Judge Becker that "the independence principle should not be a conclusive bar to subrogation"). Put more succinctly, the importance of the "independence principle" is that it prevents the issuer of the letter of credit from asserting certain defenses which would hinder prompt payment, therefore undermining the purpose behind issuing a letter of credit. Once payment is made, however, the independence principle has served its purpose, and the application of the independence principle to avoid equitable subrogation is not necessary to preserve the value of the independence principle.[8] Accordingly, once payment is made, the distinction between primary and secondary obligations becomes irrelevant.

### b. UCC

Various cryptic statements in the comments to the UCC make reference to letters of credit and guaranties.[9] These statements have been cited as supporting both sides of the debate over the subrogation of letters of credit. Unfortunately, these references cloud, rather than clear, the issue.

Some commentary is construed as supporting the majority position. The comment to section 5–101 notes that "[t]he other source of law respecting letters of credit is the law of contracts with occasional unfortunate excursions into the law of guaranty." U.C.C. § 5–101 official cmt. (1991). The comment to

5–103 notes that "[t]he issuer is not a guarantor of the performance of these underlying transactions." *Id.* § 5–103 official cmt. (1991). The comment to 5–109 notes that the "issuer receives compensation for a payment service rather than for a guaranty of performance." *Id.* § 5–109 official cmt. (1991). These comments have been relied upon in reaching the majority position, and denying equitable subrogation. *See Tudor,* 968 F.2d at 362; *In re Carley Capital Group,* 119 B.R. at 650; *In re Agrownautics, Inc.,* 125 B.R. at 353; *In re East Texas Steel Facilities, Inc.,* 117 B.R. at 241 n. 3.

However, the comment to section 5–109 of the UCC also contains one direct reference to equitable subrogation, noting that "[t]he customer will normally have direct recourse against the beneficiary if performance fails, whereas the issuer will have such recourse only by assignment *or in a proper case subrogation* to the rights of the customer."[10] U.C.C. § 5–109 official cmt. (1991) (emphasis added). This comment has been relied upon in rejecting the majority position, and concluding that the UCC allows equitable subrogation in the letter of credit context. *See Tudor,* 968 F.2d at 367 (Becker, J., dissenting).

Judge Becker argues that citation to snippets of comments to the UCC is inappropriate because these references are made with the goal of preserving the integrity of the independence principle, not to defeating the application of equitable subrogation. *Id.* (Becker, J., dissenting). Therefore, the true test is whether allowing equitable subroga-

---

**8.** Even the majority opinion in *Tudor* agreed with this argument, noting that "the vitality of the independence principle is unlikely to be substantially diminished were we to allow subrogation in this situation." *Tudor,* 968 F.2d at 363. The *Tudor* majority therefore based its decision on the fact that a different element of equitable subrogation was not met—that the party seeking subrogation satisfied the debt of another—because the obligation was primary, not secondary. *Id.*

**9.** Although Utah did not adopt the comments to the UCC when it enacted the Utah Uniform Commercial Code, Utah courts have cited the comments for guidance in interpreting provisions of the Code. *See Scharf v. BMG Corp.,* 700 P.2d 1068, 1070 (Utah 1985); *House v. Armour of*

*America, Inc.,* 886 P.2d 542, 554 (Utah App.1994) *cert. granted,* 899 P.2d 1231 (Utah 1995).

**10.** Confusion also stems from the ambiguity of the phrase "in a proper case." The *Tudor* majority resolved this issue by finding that this reference was "clearly limited to the possibility of the issuer being subrogated to the customer's rights against the beneficiary," and noted that the case before the court involved subrogation against a stranger to the letter of credit rather than the beneficiary. *Tudor,* 968 F.2d at 362–363; *see supra* note 2, discussing the various parties to which the issuer may be subrogated. In addition, the *Tudor* court noted that this comment was suggestive, rather than mandatory. *Tudor,* 968 F.2d at 363.

tion would undermine the independence principle. Judge Becker argues that the independence principle will be preserved as long as "the issuer [pays] first, without looking through to the underlying transaction.... Once the issuer has done so, ... the purpose of the independence principle has been served: the beneficiary has the money." *Id.* at 368. Furthermore, allowing subrogation would not discourage issuers from honoring letters of credit because it would place them in a more secure position than if they were not subrogated. Conversely, "the *un*availability of subsequent subrogation might discourage issuers from honoring the letters because they would have one less means of obtaining reimbursement." *Id.*

Many commentators believe the appropriate solution is through legislation.[11] To that end, the recently revised model UCC attempts to resolve the issue by revising section 5–117 to provide as follows:

> (a) *An issuer* that honors a beneficiary's presentation *is subrogated* to the rights of the beneficiary to the same extent *as if the issuer were a secondary obligor* of the underlying obligation owed to the beneficiary and of the applicant to the same extent as if the issuer were the secondary obligor of the underlying obligation owed to the applicant.
>
> (b) *An applicant* that *reimburses an issuer is subrogated* to the rights of an issuer against any beneficiary, presenter, or nominated person to the same extent *as if the applicant were the secondary obligor* of the obligations owed to the issuer and has the rights of subrogation of the issuer to the rights of the beneficiary stated in subsection (a)
>
> . . . . .
>
> (d) Notwithstanding any agreement or term to the contrary, the rights of subrogation stated in subsection (a) and (b) do not arise until the issuer honors the letter of credit or otherwise pays....

(quoted in White & Summers, *supra* note 7, § 26–15(a), at 213–14) (emphasis added). As White and Summers note, this provision,

along with the comments thereto, specifically endorses the position of Judge Becker, discussed above. *Id.* Utah, however, has not adopted revised section 5–117.

### c. The Equities

Courts often discuss the equities of the case in reaching their decisions. *See, e.g., Tudor,* 968 F.2d at 363–64; *In re Agrownautics,* 125 B.R. at 352–53; *In re Carley Capital Group,* 119 B.R. at 649–50; *In re Valley Vue Joint Venture,* 123 B.R. 199, 206, 208 (Bankr.E.D.Va.1991). Each court applies a different analysis, determined largely by the facts of the case. The *Tudor* case is once again illustrative. In *Tudor,* the majority opinion analyzed the equities, applying a three-part test. First, the court examined the position of the party claiming subrogation, specifically considering the ability to bargain for the rights received. *Tudor,* 968 F.2d at 363. Second, the majority examined the other parties who would be affected by the application of equitable subrogation, in order to determine if they would receive "detrimental" treatment. *Id.* at 364. Finally, the court noted that an adequate remedy at law existed, and that therefore equitable relief was not appropriate. *Id.*

The first consideration, that the issuer of a letter of credit can and should protect itself by contract, has support in Utah case law. This court has noted, in the context of applying equitable subrogation to a mechanics' lien:

> [T]he fact there have been few equitable subrogation cases before the courts in recent years underscores the argument that *commercially sophisticated lenders should protect themselves in contract.* Commercial lenders can easily examine the property, ask specific questions regarding the existence of intervening lienholders, acquire subordination agreements with any lienholders that exist, or, in many cases, assume the rights of the earlier lender by assignment.

*Richards v. Security Pac. Nat'l Bank,* 849 P.2d 606, 612 (Utah App.) *cert. denied,* 859 P.2d 585 (Utah 1993) (emphasis added).

---

11. *Tudor,* 968 F.2d at 369 (Becker, J., dissenting) (concluding that a statutory resolution would be

the "best solution"); Avidon, *supra* note 5, at 137 (noting that legislation would be "useful").

Indeed, there is a good argument for letting the marketplace control the details of these transactions, rather than the courts. As White and Summers note, "[m]any bankers have rued the day they issued a standby letter without assessing and treating it as a true loan or without taking solid collateral as security." White & Summers, *supra* note 7, § 26–1(b), at 110. In light of these developments, "[b]ank regulators eventually awoke to bring standby letters squarely within a bank's loan-booking requirements and all lending limits." *Id.* at 110 n. 18.

However, Judge Becker's response to the argument that issuers are contractually able to protect themselves is also persuasive:

> Generally applied, the same argument would virtually eliminate equitable subrogation altogether, for it would apply to every guaranty or suretyship contract. Moreover, in many cases this may lead to the customer receiving an undeserved windfall. A customer may default on both its obligation on the underlying transaction and its obligation to reimburse the issuer of the letter of credit, yet retain any income deriving from the original transaction. In short, the issuer's ability to protect itself may be a strong equity against it, as is the fact that it receives a fee for its services, but countervailing equities may outweigh these considerations in certain cases.

*Tudor,* 968 F.2d at 369 (Becker, J., dissenting).

The second consideration, viewing the assumptions of the other parties affected, and determining whether the application of equitable subrogation would be detrimental to their interests appears to involve a case-by-case analysis. Possible factors include the sophistication of the other parties, their expectations or assumptions, or the extent to which they had knowledge of the issuer's role in the transaction.

The third consideration, that an equitable remedy is only available where there is no remedy at law, also has support in Utah case law. "The right to an equitable remedy is an exceptional one, and absent statutory mandate, equitable relief should be granted only when a court determines that damages are inadequate and that equitable relief will result in more perfect and complete justice." *Thurston v. Box Elder County,* 892 P.2d 1034, 1040 (Utah 1995). Judge Becker, however, found such cases distinguishable and noted that he had not "found any case from Pennsylvania or *any other state* that denies equitable subrogation ... on the ground of adequate remedies at law." *Tudor,* 968 F.2d at 370 (Becker, J., dissenting) (emphasis added).

#### d. Additional Considerations

Practical considerations underlie all of the approaches already discussed, at least to some degree. Certainly, the most important consideration is the effect allowing equitable subrogation may have on the issuance of letters of credit. Judge Becker once again provides a succinct analysis of the problem:

> If courts allow traditional equitable subrogation, the transaction costs in negotiating letters of credit may be lower than under a rule where the parties must specify subrogation rights contractually.
>
> On the other hand, with the law as unsettled as it now is, prudent would-be issuers may already have reacted by demanding greater fees or security, and the system appears to be functioning well. Parties may even be willing to incorporate the entire body of equity jurisprudence by contractual reference. Perhaps in the long run, the rule that the majority adopts [denying subrogation] will not make much of a difference, as good lawyers and prudent issuers will react accordingly. I concede too that a bright-line no-subrogation rule would promote legal certainty and thereby reduce litigation costs.

*Tudor,* 968 F.2d at 369 (Becker, J., dissenting).

Another concern, identified by Judge Becker, is the value of a clear rule, versus the value of an equitable approach which can be applied on a case-by-case basis. One author's "opinion is that it is less important whether the particular rule adopted prohibits or permits subrogation than that the rule be stated clearly." Avidon, *supra* note 5, at 137.

However, others argue that the best approach is to retain subrogation, but apply it on a case-by-case basis, under an equity analysis. In his dissent in *Tudor*, Judge Becker concluded that "on balance ... the better rule is to retain subrogation on a case-by-case basis and apply it sparingly." *Tudor*, 968 F.2d at 369 (Becker, J., dissenting). It seems clear that "[p]ermitting subrogation claims in appropriate cases would provide courts with an equitable way to reallocate the 'windfall' that results when one of the parties to the transaction fails to perform its obligations." Avidon, *supra* note 5, at 137. A good argument can be made that this is exactly what the comment to section 5–109 of the UCC means when it says subrogation is appropriate in the "proper case." Finally, such an approach would be consistent with the position this court took when it noted that "[t]he equitable nature of the doctrine [of equitable subrogation] prevents articulation of an unwavering rule that applies in all cases." *Richards*, 849 P.2d at 609 (citations omitted).

### e. This Court's View

 We are persuaded that the majority position denying subrogation on letters of credit is the better position, for all the reasons discussed, most notably, for the certainty it promotes. Subrogation is an equitable remedy to be applied only to prevent clear injustice and is not appropriate in standby letter of credit transactions. A typical issuer of a standby letter of credit is entitled to immediate reimbursement from its customer under the UCC, *see* Utah Code Ann. § 70A–5–114(3) (1990), and can further secure its position with appropriate documentation.[12] Additionally, we believe the legislative arena is better suited to address the issue in a uniform manner which would provide advance notice to those affected. We therefore hold that the issuer of a letter of credit is not entitled to equitable subrogation and, as a

result, Johnson is not entitled to such rights.[13]

### CONCLUSION

The so-called "dragnet" clause in the security agreement between West One and Graphics granted West One a security interest in the inventory and accounts receivable of Graphics for both the $50,000 line of credit and the $100,000 note. However, Johnson may not claim equitable subrogation to the rights of West One in the collateral. Equitable subrogation is not available to the issuer of a letter of credit. Accordingly, Johnson, who claims to stand in the shoes of West One, may not claim priority to the collateral over Mead.

We reverse and remand for proceedings consistent with this opinion.

ORME, P.J., and WILKINS, J., concur.

---

12. Johnson is in a somewhat unusual position, as he agreed to reimburse the customer of the issuer. Johnson was, in fact, related to a principal of Graphics, the beneficiary's borrower.

13. Because our decision on the equitable subrogation issue is dispositive, we do not decide

whether there are material issues of fact on the issue of estoppel which would preclude summary judgment. Likewise, our decision that Johnson is not entitled to rights in the collateral mandates that he is not entitled to recover costs or attorney fees from that collateral.