**In re ST. CLAIR SUPPLY COMPANY, INC., Builder's Supply Company, Inc., Debtor(s).**

Bankruptcy Nos. 87–03170, 87–03174. Motion No. 89–2902–M.

United States Bankruptcy Court, W.D. Pennsylvania.

May 23, 1989.

David W. Lampl, Sable, Makoroff & Libenson Pittsburgh, Pa., for debtor.

Dennis Sypra, Asst. U.S. Trustee, Asst. U.S. Trustee's Office, Pittsburgh, Pa.

David K. Rudov and Rudov & Stein, Pittsburgh, Pa., for committee of unsecured creditors.

Lawrence N. Ravick, Ravick, Henny & Wepfer, Pittsburgh, Pa., Trustees.

Peter N. Pross, Kincaid & McGrath, P.C., Pittsburgh, Pa., for U.S. Nat. Bank.

Richard W. Schimizzi, Greensburg, Pa., and John P. Edgar, Klett, Lieber, Rooney & Schorling, Pittsburgh, Pa., for Clo Angelicchio.

William R. Bishop, Jr., Campbell, Sherrard & Burke, P.C., Pittsburgh, Pa., for Pittsburgh Sand and Gravel.

## MEMORANDUM OPINION

JUDITH K. FITZGERALD,
Bankruptcy Judge.

The matter before the court is a Request for Payment of Administrative Expense filed on behalf of Clo Angelicchio (hereafter Angelicchio). A hearing was held on May 11, 1989. Angelicchio has been a neighbor of one of Debtors' insiders (11 U.S.C. § 101(30)(B)(vi)) for twenty years and also has been acquainted and done business with other insiders for many years.

On November 20, 1987, St. Clair Supply Company, Inc. and Builder's Supply Company, Inc. (hereafter Debtors) filed a voluntary chapter 11 petition. During the next several months various hearings were held on Debtors' use of cash collateral and adequate protection of United States National Bank (hereafter USNB or Bank) with respect to a prepetition line of credit USNB issued to Debtors. One hearing, held on March 10, 1988, considered extension of a previous order granting the use of cash collateral to Debtors and adequate protection to USNB. At that time it was established that Debtors needed $400,000.00 in additional capital to continue operations into their busy season and to pay insurance premiums and interest which were then due and owing. Only $200,000.00 remained available through the USNB line of credit and it was necessary to use this amount for the insurance and interest. Debtors needed an additional $200,000.00 to secure pay-

ment for supplies. Without it, Debtors would not have been able to continue operations due to an acute cash flow problem. The trade suppliers would not provide materials to Debtors on credit but would extend sixty-day terms if guaranteed payment from an outside source. USNB was not willing to advance more than the $200,000.00 remaining on the line of credit and the creditors' committee was opposed to Debtors incurring additional debt. This court refused to permit Debtors to incur additional debt because they did not have sufficient assets to cover it and had demonstrated an inability to stay current on the $1,500,000 line then in existence. The situation culminated in issuance of court orders dated March 10, 1988, and June 23, 1988, and in the execution of certain agreements with respect to letters of credit premised on the orders. The orders and agreements are at issue herein.

At the March 10, 1988, hearing the parties in interest[1] informed the court that Debtors would attempt to obtain letters of credit in favor of the trade suppliers. The court inquired of counsel for Debtors as to the source of funding for the letters of credit to which counsel replied that the principals could either liquidate assets or borrow from family members and that insiders would be able to "make funds available." USNB repeatedly stated its position that any additional funding would have to come from outside the estate, not from the line of credit or from anything that would jeopardize its primary secured position or subject it to greater risk. The creditors' committee was adamant in its insistence that no additional charges accrue against this estate. The court was convinced that the Debtors should not be permitted to further encumber assets to obtain additional credit.

In conformance with the clear understanding of all in attendance at this hearing, the court entered the order of March

---

1. Angelicchio's counsel attempted to make much of the fact that Angelicchio was not represented in court on March 10. The fact is that Angelicchio's existence was not made known to the court on March 10. It was after that hearing that Debtors' insiders approached Angelic-

chio and asked him to put up collateral. After Angelicchio was approached he was represented at all relevant times by counsel and had access to the tape recording of the March 10 proceedings.

10, 1988, extending the effect of a previous order approving use of cash collateral until April 25, 1988. The extension was to allow Debtors time to obtain the letters of credit for its suppliers. The order provided that "No assets of the Debtor shall be used to fund, secure or guarantee said Letters of Credit." *See* order of March 10, 1988, Motion No. 88–0441–M. A final hearing on the use of cash collateral and the letters of credit was held on April 25, 1988,[2] and, on June 23, 1988, an order entitled "Modified Order Regarding Issuance of Letters of Credit" was entered. This order stated that, in accordance with the March 10 order, Debtors had been able to obtain letters of credit totalling $151,000.00, collateralized by Angelicchio's certificates of deposit. The order further provided that

> 1. The Debtors are authorized to request United States National Bank to issue Letters of Credit....
>
> 2. United States National Bank is authorized to issue such Letters of Credit....
>
> 3. The Debtors are authorized to utilize assets of the Debtors' estate to *solely* pay the fees charged by United States National Bank with respect to the issuance of the Letters of Credit *and for no other purpose concerning said Letters of Credit.*

(Emphasis denotes language interlineated by the court on the proposed order submitted by counsel.)

The order also contained no less than three references to the March 10, 1988, order which forbade any involvement of estate assets in connection with the letters of credit.

On July 18 and 19, 1988, various agreements were executed by and among USNB, Debtors, Angelicchio and certain insiders. These agreements are:

1. Promissory Demand Note executed by Debtors in favor of USNB (Exh. 1).

2. Letter of Credit Agreement between St. Clair Supply Company, Inc., Builder's Supply Company, Inc., Clo Angelicchio and USNB (Exh. 3).

3. Agreement of Guaranty and Suretyship by Clo Angelicchio (Exh. 4).

4. Pledge and Security Agreement by Clo Angelicchio (Exh. 5).[3]

Debtors' obligations under the Promissory Demand Note were secured by Angelicchio's pledge of the certificates of deposit and the suretyship agreement. In compliance with the orders of March 10 and June 23, the Letter of Credit Agreement, the Agreement of Guaranty and Suretyship and the Pledge and Security Agreement provided that "No assets of the [Debtors shall be] used to fund, secure or guaranty the Letters of Credit." *See* Letter of Credit Agreement, Exh. 3, at page 2; Agreement of Guaranty and Suretyship, Exh. 4, at page 2; Pledge and Security Agreement, Exh. 5, at pages 1–2.[4] The agreements provide that without first proceeding against Debtors, USNB may use the certifi-

---

**2.** Hearings are electronically recorded in this court but no tape is available for this date, it appearing that through some malfunction the tape is blank. The court's proceeding memo of that date consisting of the judge's notes made contemporaneously with the in-court proceedings states that, with respect to the letters of credit, "collateral [is] arranged for by O[wners] of D[ebtor] and is not D[ebtor]'s or any of its related entities [sic]."

**3.** Other agreements executed were the Assignment of Time Certificates of Deposit (Exh. 6) by Angelicchio to USNB and an Indemnity Agreement among Angelicchio and various insiders and their relatives (Exh. 8). Throughout the course of negotiations and execution of all these agreements Angelicchio was represented by counsel. Angelicchio testified that before he signed the agreements he skimmed them rather

than reading them in detail. While the degree to which Angelicchio reviewed the documents is irrelevant to these proceedings, we note the testimony only because his counsel accorded it some weight, although he did not explain its significance.

**4.** The exact language varies slightly in each agreement, to-wit: Letter of Credit Agreement, Exh. 3 at page 2 "no assets of the Borrowers [Debtors] were to be used to fund, secure or guaranty the Letters of Credit" in reference to the prohibition in the June 23, 1988 order; Agreement of Guaranty and Suretyship, Exh. 4 at page 2 "no assets of the Borrowers can be used to fund or secure or guaranty said Letters of Credit"; Pledge and Security Agreement, Exh. 5 at pages 1–2 "no assets of the above-referenced Debtors shall be used to fund or secure or guaranty said Letters of Credit."

cates of deposit to pay off amounts due to USNB immediately upon a draw on a letter of credit by one of the trade suppliers. *See* Letter of Credit Agreement, Exh. 3 at ¶ 3; Agreement of Guaranty and Suretyship, Exh. 4 at page 3, page 7, ¶ 6; Pledge and Security Agreement, Exh. 5 at Section 2. USNB proceeded against the certificates of deposit upon demand by the suppliers when Debtors failed to pay.[5] In turn, Angelicchio now asserts an administrative claim against this estate on various theories.[6]

■ Angelicchio argues that pursuant to section 364(b) of the Bankruptcy Code, the March and June orders provide his claim with section 503(b)(1) administrative expense status. *See* 11 U.S.C. §§ 364(b), 503(b)(1). He maintains that because the orders authorized Debtors to incur debt and, in compliance with the orders the debt was not secured by estate assets, his claim is entitled to payment as an administrative expense inasmuch as no one ever said or wrote that an administrative claim would be foreclosed.

An examination of the orders reveals that they authorized the Debtors to request and USNB to issue letters of credit and specified the conditions under which those events could occur. Their thrust, purpose and plain meaning was a complete prohibition of the creation of additional demands on the assets of this estate, without limitation except as to USNB's initiation fees concerning the letters of credit. The prohibition was universal to all of Debtors' assets. The absence of language specifically enumerating "no administrative claim shall exist" is not dispositive. Whereas any party may file a claim, these orders are clear that no assets of Debtors will be used to

pay the claims which may arise under the letters of credit. That all parties understood and intended to abide by the court's orders is evident by the repetition in the agreements among and between the parties of the fact that no estate assets could be used to "fund, secure or guaranty" the letters of credit and by repeated references to the March 10 order. *See* Letter of Credit Agreement, Exh. 3 at page 2; Agreement of Guaranty and Suretyship, Exh. 4 at page 2; Pledge and Security Agreement, Exh. 5 at pages 1–2. Furthermore, the June 23 order clearly established that the entire extent to which estate assets could be put at risk was to pay the fees of USNB in connection with issuing the letters of credit. The orders and agreements are unambiguous as to each party's rights and obligations. To authorize payment of the claim now would be to use Debtors' assets in violation of previous court orders. .

■ Angelicchio next asserts that he is subrogated either to the rights of USNB or to those of the trade creditors and is entitled to payment pursuant to section 509 of the Bankruptcy Code. The general rule under section 509(a) is that one who is liable with a debtor and who pays its debts is subrogated to the creditor's rights. Subsection (b)(1)(B) of 509, in conjunction with section 502, however, disallows such a claim against the estate to the extent that it is unenforceable by agreement. *See* 11 U.S.C. § 502(b)(1). Here the agreements bar payment of the claim by the estate. Letter of Credit Agreement, Exh. 3 at page 2; Agreement of Guaranty and Suretyship, Exh. 4 at page 2; Pledge and Security Agreement, Exh. 5, at pages 1–2.[7] If they

5. Angelicchio actually paid Bank in cash to avoid early withdrawal penalties charged against the certificates of deposit. For purposes of this proceeding, however, the form of payment is not at issue. Bank has released the certificates of deposit upon satisfaction in cash.

6. The total draw presented as of the hearing on May 11, 1989, was $92,579.47. Other claims were pending but were not yet due and payable. The total principal amount which could be assessed against the letters of credit is $151,-000.00.

7. The order of June 23, 1988, is attached as Exhibit A to the Letter of Credit Agreement. That order referred to the March 10, 1988 order. Thus the extent of the bar to payment of any claim from Debtors' assets was fully revealed. Moreover, Angelicchio sought and obtained a written indemnity which provided: "Whereas the Letters of Credit to be obtained by the Debtors cannot be funded, secured or otherwise guaranteed by any of the Debtors' assets...." Indemnity Agreement, Exh. 8 at page 2. Thus, Angelicchio had actual knowledge of the facts he now seeks to ignore. Further, the Indemnity Agreement also specifically makes the indemni-

had not, they would be null and void by virtue of the March and June orders. The purpose and intent of the March and June orders and all the agreements among the parties were to abrogate the effect of section 509 by ensuring that whoever provided assets in connection with this case would not have recourse against the estate. Both USNB and the trade creditors refused to rely upon collection from Debtors' assets, the court refused to permit it, and Angelicchio, coming into the formula with the availability of the entire equation before him, cannot change the result. Even if Angelicchio would be USNB's subrogee, he would not be entitled to payment. Although Debtors are obligated to USNB on the note, USNB is foreclosed from collecting against the estate on the note by virtue of the March 10 and June 23 orders. Subrogation to nothing is nothing.

■ Accordingly, with respect to Angelicchio's claim of subrogation to USNB, the laws of surety are fully applicable in this situation, unaffected by the operation of section 509 of the Bankruptcy Code. The Pennsylvania surety statute provides:

### § 1. What constitutes contract of suretyship

Every written agreement hereafter made by one person to answer for the default of another shall subject such person to the liabilities of suretyship, and shall confer upon him the rights incident thereto, unless such agreement shall contain in substance the words: "This is not intended to be a contract of suretyship," or unless each portion of such agreement intended to modify the rights and liabilities of suretyship shall contain in substance the words: "This portion of the agreement is not intended to impose the liability of suretyship." 1913, July 24, P.L. 971, § 1.

8 P.S. § 1. The statute went into effect in 1913 and has not changed. Language disclaiming the suretyship is found in none of the agreements and, therefore, Angelicchio, is estopped to deny his status as a

surety. Inasmuch as a surety is a primary obligor, there is no claim to which Angelicchio could be subrogated. That Angelicchio is a primary obligor to USNB is made clear by the language of the Agreement of Guaranty and Suretyship permitting USNB to proceed against Angelicchio without first attempting to collect from Debtors. Exh. 4 at ¶ 6. *See Hartley Silk Mfg. Co. v. Berg*, 48 Pa.Super. 419, 429 (1911) (a "suretyship ... involves no effort to collect from the ... debtor"). There are other indicia that Angelicchio is a surety under the Agreement in that the time, manner and amount of payment and liability are defined. *See Butler Savings and Trust Co. v. Phillips*, 70 Pa.Super. 318, 320–21 (1922); *Hartley Silk Mfg. Co. v. Berg*, 48 Pa.Super. 419, 428, 429–30 (1911). The fact that Debtors executed a promissory note in favor of USNB does not negate Angelicchio's independent obligation to USNB as a primary obligor.

■ Angelicchio alternatively claims that he is subrogated to the rights of the trade suppliers. The suppliers, however, have no claim against the estate because they were paid via the draws against the letters of credit. Payment extinguished any claim. Even if the suppliers had a claim, Angelicchio could not stand in their shoes. He is not their assignee and they are not parties to any of the agreements operative herein. Angelicchio's relationship with the trade suppliers, if any exists, is that of indirect donor and donee at best.

We will heed the suggestion of Angelicchio's counsel that we "should not sustain a twisted reading" of our orders, Claimant's Brief in Support of Request for Allowance of Administrative Claim at 22, and will deny the claim.

An appropriate order will be entered.

---

tors (all of whom are insiders of Debtors) sureties for Angelicchio's obligations under the Agreements. *See* Exh. 8 at page 5.