968 F.2d 357
 61 USLW 2034, 17 UCC Rep.Serv.2d 1212
 TUDOR DEVELOPMENT GROUP, INC., a Pennsylvania Corp.; Sidney
Cohen; Dorothy Cohen; Marc Cohen, trading as
Green Hill Associates,
v.
UNITED STATES FIDELITY & GUARANTY COMPANY, Dauphin Deposit
Bank and Trust Company; Green Hill Project
Investors, Inc.; York Excavating
Company, Inc., Intervenors,
Dauphin Deposit Bank & Trust Company, Appellant.
 No. 91-5773.
 United States Court of Appeals,
Third Circuit.
 Argued April 10, 1992.
Decided June 22, 1992.
Rehearing and Rehearing In Banc
Denied July 23, 1992.
 
 Timothy M. Anstine, Thomas A. French (argued), Rhoads & Sinon, Harrisburg, Pa., for appellant Dauphin Deposit.
 Lewis S. Kunkel, Jr. (argued), Timothy B. Anderson, Pepper, Hamilton & Scheetz, Harrisburg, Pa., for appellee Green Hill Project Investors.
 Thomas B. Rutter (argued), Rutter, Turner, Solomon & Dipiero, Philadelphia, Pa., for appellee Green Hill Associates.
 Before: BECKER, COWEN and GARTH, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 At issue in this case is which party is entitled to a fund of $594,000 paid into the district court. To settle this dispute we must determine whether a bank which has honored a letter of credit may be equitably subrogated to the rights of its customer vis-a-vis funds paid to the customer by a party unrelated to the original letter of credit. We conclude that because the issuing bank was satisfying its own primary liability rather than the liability of another when it made payment under the letter of credit, it may not avail itself of the common-law remedy of equitable subrogation. We will affirm the order of the district court granting summary judgment in favor of Green Hill Investors.
 
 I.
 
 2
 The $594,000 fund which is the subject of this diversity dispute was paid into the district court by United States Fidelity and Guaranty Company ("USF & G"). This lawsuit began when Green Hill Associates ("Associates") sued USF & G for the proceeds of performance bonds issued by USF & G. York Excavating Co. ("York"), Dauphin Deposit Bank and Trust Company ("Dauphin Deposit") and Green Hill Project Investors ("Investors") subsequently intervened in the action, claiming an interest in the bond proceeds. The action itself arises from the construction of a multi-family residential development in Susquehanna Township ("the Township"), Dauphin County, Pennsylvania. Dauphin Deposit appeals the district court's order granting summary judgment in favor of Investors.
 
 
 3
 Associates was the owner and developer of a subdivision construction project, known as the Green Hill Project ("the Project"). Susquehanna Construction Corporation ("SCC") was a general manager of the Project under a written agreement entered into with Associates and as such undertook to construct certain buildings and complete certain other improvements on the site. USF & G issued two performance bonds guaranteeing the faithful and timely performance of all of SCC's duties under the contract with Associates ("the USF & G bonds"). The aggregate amount of these bonds totalled $2,965,873.
 
 
 4
 Eastern Consolidated Utilities, Inc. ("ECU") also entered into a contract with Associates for certain work on the Project. Under that contract, ECU agreed to construct such improvements as internal roadways, parking areas and storm drainage systems. ECU's responsibilities under this contract were guaranteed by performance bonds issued by Employers Insurance of Wausau ("the Wausau bonds").
 
 
 5
 In order to begin work on the Project, Associates needed the approval of the Township. Therefore, Associates entered into an agreement with the Township ("the Subdivision Agreement") to complete various improvements on the site of the proposed subdivision. These improvements included the construction of grading, roads, driveways, and parking and recreation areas. The Subdivision Agreement required Associates to provide either a bond or a standby letter of credit guaranteeing the completion of the specified improvements.
 
 
 6
 Associates applied for an irrevocable standby letter of credit from Dauphin Deposit in order to satisfy the Subdivision Agreement. Dauphin Deposit accepted Associates' application and issued a letter of credit in favor of the Township for the account of Associates. The face amount of the letter was $1,088,646. The letter provided that it would be payable upon the Township's certification that the required site improvements had not been completed as required by the Subdivision Agreement. Dauphin Deposit received a fee of $75 plus 1.5% per annum of the face amount of the letter of credit. Associates also agreed to reimburse Dauphin Deposit if Dauphin honored the letter of credit ("the reimbursement agreement"). The reimbursement agreement did not include an assignment of Associates' rights in the USF & G bonds in the event of honor.
 
 
 7
 As security in the event of honor, Dauphin Deposit received a collateral note executed by the Tudor Development Group ("Tudor"), Associates' general partner on the project, and an assignment of the proceeds of the Wausau performance bonds. As noted, Dauphin Deposit did not obtain an assignment of the USF & G bonds nor did it file financing statements perfecting its security interest in any of the collateral it did obtain in connection with the issuance of the letter of credit.
 
 
 8
 Sometime in May, 1987, SCC defaulted under its contract with Associates. Subsequently, Associates was declared in default of its obligations to build the site improvements under the subdivision agreement with the Township. As a result, on April 6, 1988, the Township issued its draft in the amount of $800,202 against the Dauphin Deposit letter of credit. Dauphin Deposit paid on the Township's draft. To date, Dauphin Deposit has not been reimbursed by Associates for its payment under the letter of credit.
 
 
 9
 Following SCC's default, Associates submitted a claim to USF & G for payment under the USF & G performance bonds. On September 14, 1989, Associates' bond claims against USF & G were settled, with USF & G agreeing to make a payment totalling $609,000. In exchange for this payment, Associates executed a release and assignment under which USF & G was freed from any and all claims arising from the Project. Of this settlement, $594,000 was paid into the district court to be held pending resolution of the various parties' claims to the fund.
 
 
 10
 Associates presently asserts a claim against the fund as obligee under the USF & G bonds. As a part of its settlement with USF & G, Associates assigned a portion of its rights in the bonds to Investors. Thus Investors now claims the proceeds of the fund based on Associates' partial assignment of the bond proceeds. Dauphin Deposit contends that it is equitably subrogated to Associates' interest in the fund by reason of its payment to the Township under the letter of credit, for which it has not been reimbursed. Furthermore, Dauphin Deposit claims that the partial assignment by Associates to Investors could not divest Dauphin Deposit of its rights to the fund because its right to be equitably subrogated attached at the time it honored the letter, which was prior to the time of Associates' partial assignment to Investors.
 
 
 11
 Dauphin Deposit obtained a judgment against Tudor under the collateral note which it obtained as security but has not executed that judgment. Dauphin Deposit has neither sought nor obtained a judgment against Associates.
 
 
 12
 The district court, on cross-motions for summary judgment by Investors and Dauphin Deposit, concluded that there were no disputed issues of material fact and granted summary judgment in favor of Investors.[1] The district court concluded that a bank which issues a standby letter of credit cannot accede to the rights of its customer on a theory of equitable subrogation and that even if such relief were available, the undisputed facts did not support granting Dauphin Deposit an equitable interest in the USF & G bond proceeds. This appeal followed.
 
 
 13
 Our review of the district court's determination of a question of law is plenary. Carter v. Rafferty, 826 F.2d 1299, 1304 (3d Cir.1987), cert. denied, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988). The clearly erroneous standard of review is applied to findings of fact. Id. When an action is decided on motion for summary judgment, this court must apply the same test that the district court was required to apply pursuant to Federal Rule of Civil Procedure 56(c): summary judgment is properly granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.
 
 II.
 
 14
 Before addressing the substantive legal questions raised by this appeal, we think it useful to provide a brief overview of letters of credit law and the relationships among the parties to letter of credit transactions. In short, a letter of credit is an engagement by an issuer, usually a bank, made at the request of a customer for a fee, to honor a beneficiary's drafts or other demands for payment upon satisfaction of the conditions set forth in the letter of credit. 13 Pa.Cons.Stat.Ann. § 5103(a) (1984).
 
 
 15
 There are two types of letters of credit: commercial and standby. A commercial letter of credit is used in a sales situation where the seller is unfamiliar with the creditworthiness of the buyer. American Ins. Ass'n v. Clarke, 865 F.2d 278, 282 (D.C.Cir.1988). To assure the seller that he will receive the benefits of his performance, the buyer obtains a letter of credit naming the seller as beneficiary. Wood v. R.R. Donnelley & Sons Co., 888 F.2d 313, 317 (3d Cir.1989). Under the terms of the letter, the issuer undertakes to purchase documents presented by the beneficiary (the seller) that conform to the terms set forth in the letter. Id.
 
 
 16
 Standby letters of credit differ from commercial letters in some respects. The beneficiary of a commercial letter of credit may draw upon the letter simply by presenting the requisite documents showing that the beneficiary has performed and is entitled to the funds. A standby letter requires the production of documents showing that the customer has defaulted on its obligation to the beneficiary, which triggers the beneficiary's right to draw down on the letter. Id. Standby letters are usually used in non-sales contracts such as contracts for the construction of a building, the provision of services, or some other contract where the performance of one party is executory. See John F. Dolan, The Law of Letters of Credit: Commercial and Standby Credits p 1.06 (2nd ed. 1991). No distinction is made in the UCC between commercial and standby letters of credit.
 
 
 17
 The most salient feature of a letter of credit and the principal reason for its use in commercial transactions is the "independence principle." This means that the letter of credit is a commercial instrument completely separate from the underlying contract between the customer and the beneficiary. Wood, 888 F.2d at 318. The independence principle obliges the issuer to honor the draft when the beneficiary presents conforming documents without reference to compliance with the terms of the underlying contract between the customer and the beneficiary. See, e.g., 13 Pa.Cons.Stat.Ann. § 5114(a).[2] This "independence" means that should disagreement arise between customer and beneficiary, the dispute is resolved with the money already in the pocket of the beneficiary. It also means that when an issuer makes payment under a letter of credit, the issuer is satisfying its own primary obligation to the beneficiary, without reference to the rights of its customer under the underlying contract with the beneficiary.
 
 
 18
 In contrast, a guarantor is subject to liability only if the beneficiary has sought and has been unable to obtain payment from the party who is primarily liable on the debt. Therefore a guarantor is actually liable for the debt of another party which that party has failed to satisfy.
 
 
 19
 In this case, the customer in the letter of credit transaction was Associates. The contract underlying the letter of credit was the subdivision agreement entered into by Associates and the Township, and the Township was the beneficiary of the letter of credit. Dauphin Deposit, the issuer, was obligated under the terms of the letter to honor the Township's demand for payment when the Township certified that the agreed upon improvements had not been made by Associates. Id. at § 5114(a). Once Dauphin Deposit honored the letter, Associates, as its customer, had an immediate statutory obligation to reimburse Dauphin, the issuer, id. at § 5114(c), and was also obligated to do so under the terms of the reimbursement agreement.
 
 
 20
 While section 5114(c) states that the issuer shall be reimbursed, there are no comparable statutory provisions indicating the manner in which such reimbursement shall occur. The method of reimbursement is a matter left to negotiations between the parties. In this case, the reimbursement obligation was memorialized contractually in the reimbursement agreement entered into by Associates and Dauphin Deposit. In addition, Dauphin Deposit negotiated for assignment rights in certain collateral held by Associates, namely its rights under the Wausau performance bonds and also looked to the Tudor promissory note as collateral in its dealings with Associates.
 
 III.
 
 21
 The classic explanation of the doctrine of equitable subrogation is as follows:
 
 
 22
 Where property of one person is used in discharging an obligation owed by another or a lien upon property of another, under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee or lien-holder.
 
 
 23
 Gladowski v. Felczak, 346 Pa. 660, 31 A.2d 718, 720 (1943) (quoting Restatement of Restitution § 162 (1937)). Generally, the following five prerequisites must be satisfied before a claimant may avail itself of the remedy of equitable subrogation: (1) the claimant paid the creditor to protect his own interests; (2) the claimant did not act as a volunteer; (3) the claimant was not primarily liable for the debt; i.e., secondary liability; (4) the entire debt has been satisfied; and (5) allowing subrogation will not cause injustice to the rights of others. See, e.g., United States Fidelity and Guaranty Co. v. United Penn Bank, 362 Pa.Super. 440, 524 A.2d 958, 963-64, alloc. denied, 517 Pa. 609, 536 A.2d 1333 (1987).
 
 
 24
 Pennsylvania law offers little guidance, however, on the question of whether the doctrine is applicable in the context of letters of credit. This dearth of state case law is best explained by the simple fact that the question of subrogation usually arises in the bankruptcy setting. The issuer which has honored a demand for payment under a letter of credit has an immediate and unconditional statutory right to reimbursement from its customer and has usually secured adequate collateral to make itself whole in the event of honor. If the customer becomes bankrupt, however, the issuer's only practical recourse is asserting a claim in the bankruptcy proceeding. Therefore, most of the law related to the issue presented in this appeal comes from the bankruptcy courts rather than state courts. We look, then, to those cases for guidance.
 
 
 25
 Those courts which have considered the question presently before us have disagreed as to whether the remedy of equitable subrogation is available. The minority view advocates the availability of equitable subrogation, see In re Valley Vue Joint Venture, 123 B.R. 199 (Bankr.E.D.Va.1991); In re National Service Lines, Inc., 80 B.R. 144 (Bankr.E.D.Mo.1987); In re Sensor Systems, Inc., 79 B.R. 623 (Bankr.E.D.Pa.1987); In re Minnesota Kicks, Inc., 48 B.R. 93 (Bankr.D.Minn.1985), whereas the majority of courts to consider the issue, as well as the district court in this case, have refused to grant the issuing bank equitable subrogation rights following honor under a letter of credit. See In re Carley Capital Group, 119 B.R. 646 (W.D.Wis.1990); In re Agrownautics, Inc., 125 B.R. 350 (Bankr.D.Conn.1991); In re East Texas Steel Facilities, Inc., 117 B.R. 235 (Bankr.N.D.Tex.1990); In re St. Clair Supply Co., Inc., 100 B.R. 263 (Bankr.W.D.Pa.1989); In re Kaiser Steel Corp., 89 B.R. 150 (Bankr.D.Colo.1988); In re Munzenrieder Corp., 58 B.R. 228 (Bankr.M.D.Fla.1986); In re Economic Enterprises, Inc., 44 B.R. 230 (Bankr.D.Conn.1984); cf. In re Glade Springs, Inc., 826 F.2d 440 (6th Cir.1987) (confirming bank (Chemical) which in effect guaranteed that issuing bank's (UAB) letter of credit would be honored, may be equitably subrogated to the rights of the issuing bank which had received security from its customer). We agree with the majority view that a bank which issues a letter of credit may not accede to the rights of its customer on a theory of equitable subrogation.[3]
 
 
 26
 Courts grappling with this issue have generally concluded that while there are some superficial similarities between guarantees and letters of credit, their "legal" characteristics remain quite distinct and thus the remedies available should remain distinct as well. See In re Carley Capital, 119 B.R. 646; In re Agrownautics, 125 B.R. 350; In re East Texas Steel, 117 B.R. 235. As noted by the district court, the key distinction between letters of credit and guarantees is that the issuer's obligation under a letter of credit is primary whereas a guarantor's obligation is secondary--the guarantor is only obligated to pay if the principal defaults on the debt the principal owes. In contrast, while the issuing bank in the letter of credit situation may be secondarily liable in a temporal sense, since its obligation to pay does not arise until after its customer fails to satisfy some obligation, it is satisfying its own absolute and primary obligation to make payment rather than satisfying an obligation of its customer. Having paid its own debt, as it has contractually undertaken to do, the issuer "cannot then step into the shoes of the creditor to seek subrogation, reimbursement or contribution from the [customer]. The only exception would be where the parties reach an agreement to the contrary." In re Kaiser Steel, 89 B.R. at 153.
 
 
 27
 The distinct nature of the obligations which arise with respect to letters of credit and guarantees is also reflected in a number of provisions of the UCC itself. See 13 Pa. Cons.Stat.Ann. § 5103 cmt. ("[t]he issuer is not a guarantor of the performance of these underlying transactions"); 13 Pa.Cons.Stat.Ann. § 5101 cmt. ("[t]he other source of law respecting letters of credit is the law of contracts with occasional unfortunate excursions into the law of guaranty"); 13 Pa.Cons.Stat.Ann. § 5109 cmt. ("issuer receives compensation for a payment service rather than for a guaranty of performance"). While we recognize that arguments may be made and have been made in support of allowing subrogation, we believe that Article 5 of the UCC, when viewed in its entirety, evinces an intent to keep the law of guarantee and the law of letters of credit separate. In our view, the Uniform Commercial Code Committee, rather than the federal courts, is best equipped to address this problem. See The Task Force on the Study of U.C.C. Article 5, An Examination of U.C.C. Article 5 (Letters of Credit), 45 Bus.Law. 1527 (1990) (Task Force, while reaching no conclusion as to whether subrogation is appropriate, suggests it would be useful to resolve issue by statute); Michael E. Avidon, U.C.C. Article 5 Symposium: Subrogation in the Letter of Credit Context, 56 Brook.L.Rev. 128, 138 (1990) ("[i]n addition to providing needed guidance as to rights and obligations in what has been a murky area of the law, wellcrafted legislation will curb the excesses of courts ... in their zeal to do equity in particular cases").
 
 
 28
 The UCC does contain one direct reference to the possibility of subrogation in the letter of credit context: "[t]he customer will normally have direct recourse against the beneficiary if performance fails, whereas the issuer will have such recourse only by assignment of or in a proper case subrogation to the rights of the customer." 13 Pa.Cons.Stat.Ann. § 5109 cmt. This comment, however, is clearly limited to the possibility of the issuer being subrogated to the customer's rights against the beneficiary. In the present case, rather than seeking subrogation rights against the beneficiary of the letter, Dauphin Deposit seeks subrogation rights against a stranger to the letter of credit issued in favor of the Township. In any event, this comment merely suggests rather than mandates the availability of subrogation in certain cases.
 
 
 29
 Finally, we note that some courts have determined that equitable subrogation is not available to a bank which has honored a letter of credit, but has not been reimbursed. These courts have rejected the remedy of equitable subrogation in the belief that allowing subrogation would abrogate the independence principle which is the cornerstone of letter of credit law. See In re Carley Capital, 119 B.R. at 651; In re East Texas Steel, 117 B.R. at 241; In re Economic Enterprises, 44 B.R. at 232. The district court in this case disagreed with that assessment and concluded that "the independence principle is technically not violated by allowing Dauphin Deposit to proceed against its customer." App. at 1144. We agree with the district court that the vitality of the independence principle is unlikely to be substantially diminished were we to allow subrogation in this situation. However, as noted, one of the principal requirements of equitable subrogation has not been satisfied here--that the party seeking subrogation have satisfied the debt of another--and therefore we conclude that the district court correctly determined that the remedy cannot be invoked in this case. Moreover, as will be discussed, the equities do not favor granting subrogation rights in this case.
 
 IV.
 
 30
 Even if we were to ignore the fact that Dauphin Deposit has failed to meet the technical requirements to avail itself of the remedy of subrogation since it was satisfying its own primary obligation in paying under the letter of credit, we would nevertheless be compelled to reject its claimed right to the remedy of equitable subrogation on these facts. As the district court concluded, the equities do not favor subrogation in this case.
 
 
 31
 When Dauphin Deposit agreed to issue a letter of credit on behalf of its customer, Associates, it was in a position to bargain for whatever security it thought appropriate. It chose to contract for an assignment of rights in the Wausau bonds and received a promissory note from Tudor. In addition, Dauphin Deposit received a large annual fee for the service of issuing the credit based upon the face amount of the letter. It could have contracted for an assignment of rights in the USF&G bonds but did not do so.
 
 
 32
 Presumably, at the time these arrangements were made Dauphin was satisfied with the collateral it received and the creditworthiness of its customer. However, now that Dauphin has discovered that it made a poor business decision in not contracting for an assignment of rights in the USF & G bonds, it seeks our help in gaining additional rights. As the district court properly concluded, there is no apparent reason why the court should exercise its equitable powers to rewrite the contract between the parties to give Dauphin Deposit more security than it bargained to receive. See In re Carley Capital, 119 B.R. at 650 (no equitable reason to grant subrogation where "the plaintiffs had the ability by virtue of the contracts with the parties with whom they dealt to protect themselves in exactly the same way that they seek to protect themselves by subrogation"); In re Munzenrieder, 58 B.R. at 231 (fact that security received turned out to be useless "means nothing more or less than that the Bank entered into a transaction which ... turned out to be a total loss, a fact legally meaningless and insufficient to invoke the doctrine of equitable subrogation").[4]
 
 
 33
 In assessing the equities of the situation, we must also look to the other parties who could or would be affected by a decision to allow subrogation in this case. Those parties who engaged in business dealings with Associates subsequent to the issuance of the letter of credit, including Investors, to whom Associates assigned its rights in the USF & G bonds, assumed they would be free from any future claims by Dauphin Deposit with respect to the letter of credit. We do not believe the equities favor treating Dauphin Deposit in a manner which would be detrimental to those parties who had subsequent dealings with Associates.
 
 
 34
 Finally, we note that as a general matter, equitable relief is not appropriate where a party has an adequate legal or statutory remedy. Clark v. Pennsylvania State Police, 496 Pa. 310, 436 A.2d 1383, 1385 (1981). Here, Dauphin Deposit appears to have two legal remedies and one statutory remedy: (1) seek judgment against Tudor on the promissory note; (2) sue Associates directly under the Reimbursement Agreement; and (3) seek reimbursement under 13 Pa.Cons.Stat.Ann. § 5114(c) which provides that an issuer is entitled to immediate reimbursement from its customer in the event of honor. In determining whether a remedy is "adequate," we must look to its availability and not to the likelihood of its success. Willing v. Mazzocone, 482 Pa. 377, 393 A.2d 1155, 1158 (1978); Chartiers Valley School Dist. v. Virginia Mansions Apts., Inc., 340 Pa.Super. 285, 489 A.2d 1381, 1386 (1985). Thus the fact that the remedies set forth above might not make Dauphin Deposit whole does not mandate a finding that such remedies are inadequate, thereby requiring this court to grant equitable relief.
 
 V.
 
 35
 In sum, we conclude that equitable subrogation is not an appropriate remedy in this situation, both because an issuing bank which honors a letter of credit makes good its own primary obligation, rather than fulfilling the obligation of another, and because the equities of the case before us do not warrant it. We will affirm the judgment of the district court granting summary judgment in favor of Investors.
 
 
 36
 BECKER, Circuit Judge, dissenting.
 
 
 37
 This appeal presents a close, difficult, and important question that has divided both courts and scholars. The majority concludes that, under Article 5 of the Uniform Commercial Code and the common law, a bank that has issued a standby letter of credit may never qualify for equitable subrogation to the rights of its defaulting customer in the underlying commercial transaction. The majority opinion is a fine piece of advocacy for a respectable position, one that has been adopted by a majority of the courts to face the issue (although rejected by the only federal appellate court that has reached the question). Nevertheless, I believe that the majority has backed the wrong horse. I would hold that an issuer of a standby letter of credit may, in proper circumstances, obtain equitable subrogation to the rights of its customer.
 
 
 38
 The majority also concludes that, even assuming that equitable subrogation is available in some cases, the equities in this case do not warrant it. Because I believe that genuine issues of material fact remain on this issue, I would not decide it on summary judgment. I would instead remand the case to the district court for further proceedings to determine whether the facts and equities here weigh in favor of or against Dauphin Deposit's claim. I therefore respectfully dissent.
 
 
 39
 I. THE GENERAL AVAILABILITY OF SUBROGATION TO AN ISSUER OF A
 
 LETTER OF CREDIT
 
 40
 Investors offers three reasons why issuers of standby letters of credit should not be entitled to subrogation. First, Investors argues that an issuer does not qualify for subrogation as a matter of common law because the issuer is primarily liable on its obligation to the beneficiary, not secondarily liable for the debt of another, as the common law requires. Second, Investors contends that the principles undergirding Article 5 of the U.C.C. bar subrogation by issuers of letters of credit. Finally, Investors suggests that an issuer can (and Dauphin Deposit did) protect itself adequately by insisting on security before agreeing to issue a letter of credit. In Investors' view, subrogation should be denied because it would only protect the imprudent issuer. Because each issue is close, difficult, and important, and because Article 5 of the U.C.C. is under study for possible major revision, I will discuss all three.
 
 
 41
 A. Common Law Bar: Primariness of the Issuer's Obligation
 
 
 42
 The centerpiece of the majority's position is that Dauphin Deposit was primarily liable on its own obligation to the township under the letter of credit. In its view, Dauphin Deposit, as a primary obligor paying its own debt rather than the debt of another, cannot seek subrogation. In my view, the majority takes undue advantage of the ambiguity of the terms "primary" and "secondary" liability.
 
 
 43
 Certainly, Dauphin Deposit was "primarily" liable in one temporal sense, in that, pursuant to the letter of credit arrangement, it had to pay the township immediately on the township's proper demand, with (unlike a guarantor or surety) no right to assert any defenses that Associates may have had. On the other hand, even the majority concedes that Dauphin Deposit was temporally "secondarily" liable in the sense that its obligation arose only after Associates failed to satisfy its obligation. [Majority op. at 362.] I agree with the majority that Dauphin Deposit was "primarily" liable in the sense that (like a surety) it was directly liable, under its own contractual agreement, to make a payment to the township. But that is not the relevant meaning of "primary" liability in the subrogation context, for if it were, then no guarantor or surety would ever qualify for equitable subrogation.[1]
 
 
 44
 In my view, the relevant question is whether Dauphin Deposit was "secondarily" liable in the sense that it paid the debt of another, Associates. Investors, and the majority, have
 
 
 45
 failed to distinguish the primary liability of a debtor to its creditor to repay a loan and the primary obligation of the issuer to its beneficiary to honor a letter of credit. When a standby credit supporting a loan is honored, the issuer admittedly is satisfying its obligation as a primary obligor to honor the standby credit, but at the same time it is in fact satisfying a debt for which a person other than the issuer is primarily liable....
 
 
 46
 [T]he notion that an issuer's obligation to honor the letter of credit is a "primary obligation" should be interpreted to mean that, under the independence principle, the issuer may not avoid its obligation to honor the credit by identifying deficiencies in underlying contracts or by otherwise asserting defenses that are typically available to parties who are generally considered to be "secondarily liable" such as guarantors and sureties. Thus ... the "primary obligation" language in the letter of credit context concerns itself with the issuer's ability to avoid honoring its letter of credit, whereas the "primary liability" language in the subrogation context concerns itself with whether the entity, after reducing a claim of a creditor, received the consideration from the creditor.
 
 
 47
 In re Valley Vue Joint Venture, 123 B.R. 199, 204, 206 (Bankr.E.D.Va.1991).
 
 
 48
 In this case, Dauphin Deposit paid the debt of another when it satisfied Associates' obligation. Associates was liable to the township to make site improvements. Dauphin Deposit's letter of credit served as the township's backup in case Associates defaulted. Associates did default, and Dauphin Deposit, pursuant to its obligation under the letter of credit, satisfied Associates' obligation to the township.
 
 
 49
 As the issuer of a letter of credit, Dauphin Deposit had fewer defenses than would the issuer of a guaranty or performance bond, but the substance of Dauphin Deposit's obligation was nevertheless essentially similar to that of a guarantor or surety. There can be no doubt that all three parties considered Dauphin Deposit as a de facto surety and the letter of credit as a substitute for a performance bond. Paragraph 5 of the subdivision agreement provides:
 
 
 50
 As a further condition to approval of said Plan, Subdivider shall furnish a * in the amount of One Million Eighty-eight Thousand Six Hundred Forty Six ($1,088,646.00) Dollars to guarantee the proper completion of the improvements required by the Ordinance. * Irrevocable Straight Letter of Credit No: S-10181 from Dauphin Deposit Bank and Trust Company
 
 
 51
 The parties struck out the word "bond" and replaced it with a reference to the letter of credit. Quite clearly, the parties intended the letter to serve the same economic role as a performance bond would have: "to guarantee the proper completion of the improvements required by the Ordinance" (emphasis added).
 
 
 52
 Guarantors and sureties pay their own legal obligations, yet they are still entitled to seek equitable subrogation as well as contractual subrogation. That is because in meeting their own "primary" obligations, guarantors and sureties are also "secondarily" liable to pay others' debts. So far as the common law is concerned, the same logic should apply to issuers of letters of credit such as Dauphin Deposit.
 
 
 53
 Thus I conclude that the common law by itself poses no bar to the assertion of subrogation rights by issuers of letters of credit. I next turn to whether the U.C.C.'s statutory provisions on letters of credit require a different result.
 
 B. The U.C.C. Statutory Bar
 1. Prohibition by the Text of Article 5
 
 54
 As just mentioned, Dauphin Deposit's basic theory is that its role was as a quasi-guarantor, and thus, like a guarantor, it is entitled to equitable subrogation. As the majority notes, however, the text of and official commentary to Article 5 of the U.C.C. make clear that a letter of credit is not equivalent to a guaranty.
 
 
 55
 The "independence principle" is the cornerstone of Article 5 and the law of letters of credit. Under the independence principle, the issuer of a letter of credit (unlike a guarantor) generally may not look to the underlying transaction and assert the defenses of the party whose obligation is guaranteed. Instead, the issuer must look only at the documents presented by the beneficiary and determine if they, on their face, meet the conditions that invoke the issuer's obligation to pay on the letter of credit. See 13 Pa.Cons.Stat.Ann. § 5114(a) (Purdon 1984) (equivalent to U.C.C. § 5-114(1)) and comment 1 thereto. In short, the issuer must pay first and worry about its reimbursement and the merits of the dispute involving its customer later. Id.
 
 
 56
 Accordingly, the issuer's duty to its customer does not ordinarily include liability for performance of the underlying contract. See 13 Pa.Cons.Stat.Ann. § 5109(a) (Purdon 1984) (equivalent to U.C.C. § 5-109(1)). The commentary explicitly notes that "the issuer receives compensation for a payment service rather than for a guaranty of performance." Id. comment 1. Correlatively, the customer must, upon request, immediately reimburse the issuer if the issuer honored the letter according to its terms, again without regard to the merits of any dispute over the underlying transaction. See 13 Pa.Cons.Stat.Ann. § 5114(c) (Purdon 1984) (equivalent to U.C.C. § 5-114(3)). Moreover, the commentary to Article 5 suggests that the law of letters of credit has been marred by "occasional unfortunate excursions into the law of guaranty." 13 Pa.Cons.Stat.Ann. § 5101 comment (Purdon 1984) (official comment to U.C.C. § 5-101). The U.C.C. undeniably declares its intention "to set an independent theoretical framework for the further development of letters of credit." Id.
 
 
 57
 From these snippets, Investors argues and the majority apparently concludes that subrogation would be contrary to the spirit, if not the letter, of the Code. I am not persuaded. The drafters' concern about importing the law of guaranty was not about subrogation, but about eroding the independence principle (which, as I shall explain in the next section, is not compromised by allowing subrogation). The drafters of Article 5 took great pains to establish the independence principle in order to promote smooth commercial relations, but it does not follow that they intended to do away with subrogation simply because guarantors are eligible for subrogation. As one court has observed,
 
 
 58
 [w]hile a letter of credit may require conformity with certain obligations and formalities which are not required of a guarantee, where there is no contrary policy reason for treating them dissimilarly for other purposes, precluding the assertion of subrogation rights to issuers of standby letters of credit while allowing guarantors to assert them would be no more than an exercise in honoring form over substance.
 
 
 59
 In re Minnesota Kicks, Inc., 48 B.R. 93, 104-05 (Bankr.D.Minn.1985) (citation omitted).
 
 
 60
 Indeed, the U.C.C. commentary explicitly anticipates that issuers will have recourse against beneficiaries by way of subrogation to the rights of their customers, at least in appropriate cases:
 
 
 61
 The customer will normally have direct recourse against the beneficiary if performance fails, whereas the issuer will have such recourse only by assignment of or in a proper case subrogation to the rights of the customer.
 
 
 62
 13 Pa.Cons.Stat.Ann. § 5109 comment 1 (official comment to U.C.C. § 5-109).
 
 
 63
 This official commentary disproves any suggestion that the drafters of Article 5 considered subrogation antithetical to the law of letters of credit. On the other hand, this comment does not prove that subrogation should apply in this case as a matter of course. First, the comment speaks of subrogation to the customer's right against the beneficiary, and Dauphin Deposit seeks subrogation to Associates' rights against USF & G, not the township. More basically, the question remains what classes of cases are "proper" cases. On that score, there is little legislative history behind Article 5 to turn to, for the case law on subrogation in letter of credit contexts was extremely sparse before the adoption of the Code. See Michael Evan Avidon, Subrogation in the Letter of Credit Context, 56 Brook.L.Rev. 129, 133-34 (1990); Peter R. Jarvis, Standby Letters of Credit--Issuers' Subrogation and Assignment Rights--Part I, 9 U.C.C. L.J. 356, 375-77 (1976).
 
 
 64
 In sum, the text and commentary of the U.C.C. itself do not rule in or rule out subrogation in the letter of credit context. I therefore look to policy reasons (including policies embedded in the Code, such as the independence principle) to determine what is a "proper" case for subrogation.
 
 
 65
 2. Interference with the Independence Principle
 
 
 66
 The recent American Bar Association/U.S. Council on International Banking Task Force on the Study of U.C.C. Article 5 reached no definitive conclusion on when and whether subrogation is available in the letter of credit context, although it agreed that statutory resolution of the question would be useful. See its report, An Examination of U.C.C. Article 5 (Letters of Credit) 21 (Sept. 29, 1989), reprinted in 45 Bus.Law. 1527 (1990). The task force did agree, however, that "the question of the availability of subrogation is one which must be regarded as being essentially outside of credit law and the letter of credit transaction," and that "the primary factor in determining [subrogation's] availability should be whether it would affect the integrity of principles vital to letter of credit law." Id.
 
 
 67
 As noted above, the cornerstone of the law of letters of credit is the independence principle, and thus if granting subrogation to issuers of letters of credit would undermine the independence principle, then such subrogation must not be permitted. In my view, allowing the issuer of a letter of credit to subrogate to the rights of its customer would not undermine the independence principle.
 
 
 68
 The independence principle ensures the beneficiary of prompt payment and basically determines that the beneficiary will have the dollars in its pocket if there is a dispute between it and the customer over the underlying transaction. See, for example, Itek Corp. v. First National Bank of Boston, 730 F.2d 19, 24 (1st Cir.1984). As discussed above, this distinguishes a letter of credit from an ordinary guaranty: a guaranty is not independent in this sense, and guarantors may generally assert defenses available to the party whose obligation is guaranteed.
 
 
 69
 Investors suggests that the independence principle must be viewed as a wall between the letter of credit side and the underlying transaction side. Some courts have similarly argued that allowing subrogation would permit an issuer to interfere with the underlying contract. See, for example, In re Economic Enterprises, 44 B.R. 230, 232 (Bankr.D.Conn.1984). But the point of the independence principle is not to set up a wall for the sake of a wall, but to serve certain purposes. The independence principle undoubtedly requires the issuer to pay first, without looking through to the underlying transaction. Subrogation should therefore be unavailable before the issuer has paid the beneficiary. Once the issuer has done so, however, as Dauphin Deposit has here, the purpose of the independence principle has been served: the beneficiary has the money.
 
 
 70
 Insistence on perpetual separation is thus pointless formalism.[2] On a more pragmatic level, I would agree that if the possibility of subsequent subrogation would discourage issuers from honoring already-issued letters of credit,[3] then subrogation should not be permitted, because that would undercut the purposes of Article 5. But I cannot see why that would be so. If anything, the unavailability of subsequent subrogation might discourage issuers from honoring the letters because they would have one less means of obtaining reimbursement.
 
 
 71
 In sum, the policies underlying Article 5 of the U.C.C. do not require courts to deny subrogation to all issuers of standby letters of credit. The remaining question is whether other policy considerations commend the per se rule argued by Investors and adopted by the majority.
 
 C. Other Policy Considerations
 
 72
 1. The Issuer's Ability to Protect Itself Contractually
 
 
 73
 In my view, Investors' (and the majority's) best argument is that the issuer of a letter of credit is perfectly able to protect itself contractually. That is, the issuer receives a payment for its services and may also demand assignment rights to collateral in the event that it is forced to pay on the letter. Investors argues that Dauphin Deposit made a deal with Associates and received certain collateral rights, including assignment rights to the other bonds involved in the Green Hill Project (the "Wausau bonds"). It is certainly fair to ask why Dauphin Deposit should receive the additional right of subrogation, simply because it made a bad gamble or wasn't wary enough when negotiating its reimbursement agreement with Associates. Many courts have voiced similar concerns. See, for example, In re Agrownautics, Inc., 125 B.R. 350, 353 (Bankr.D.Conn.1991); In re Carley Capital Group, 119 B.R. 646, 650 (W.D.Wis.1990).
 
 
 74
 Nevertheless, this argument, although powerful, proves too much. Generally applied, the same argument would virtually eliminate equitable subrogation altogether, for it would apply to every guaranty or suretyship contract. Moreover, in many cases this may lead to the customer receiving an undeserved windfall. A customer may default on both its obligation on the underlying transaction and its obligation to reimburse the issuer of the letter of credit, yet retain any income deriving from the original transaction. In short, the issuer's ability to protect itself may be a strong equity against it, as is the fact that it receives a fee for its services, but countervailing equities may outweigh these considerations in certain cases. See In re Glade Springs, Inc., 826 F.2d 440, 442 (6th Cir.1987) (reinstating the subrogation remedy that had been ordered by the bankruptcy court, 47 B.R. 780 (Bankr.E.D.Tenn.1985)).[4]
 
 2. Efficiency
 
 75
 At bottom, what concerns me most is how the rule that courts adopt will affect incentives to issue letters of credit in the first place. It is possible that if no equitable subrogation were permitted, fewer banks would issue such letters, which would be commercially undesirable. Given the vagaries of commerce, it may be difficult for the issuer to forecast precisely which security will have value years down the road. If courts allow traditional equitable subrogation, the transaction costs in negotiating letters of credit may be lower than under a rule where the parties must specify subrogation rights contractually.
 
 
 76
 On the other hand, with the law as unsettled as it now is, prudent would-be issuers may already have reacted by demanding greater fees or security, and the system appears to be functioning well. Parties may even be willing to incorporate the entire body of equity jurisprudence by contractual reference. Perhaps in the long run, the rule that the majority adopts will not make much of a difference, as good lawyers and prudent issuers will react accordingly. I concede too that a bright-line no-subrogation rule would promote legal certainty and thereby reduce litigation costs.
 
 
 77
 The issue is very close, but on balance I think that the better rule is to retain subrogation on a case-by-case basis and apply it sparingly. When the unexpected happens, as it so often does, it is desirable to leave courts with equitable powers to avoid windfalls and to achieve a result fair to all parties. Certainly that was the solution of the common law, and I have found nothing in the U.C.C. as adopted in Pennsylvania that justifies my predicting that the Pennsylvania Supreme Court would vote to oust the common law in this field. See also 13 Pa.Cons.Stat.Ann. § 1103 (equivalent to U.C.C. § 1-103) (supplemental common law principles continue to apply unless explicitly displaced by the U.C.C.).
 
 
 78
 As noted above, Article 5 of the U.C.C. has been under study by a task force. That study recommended that the question of subrogation rights be resolved statutorily. I agree that that is the best solution. Perhaps further policy study will show that the equitable subrogation game isn't worth the candle, and the U.C.C. will be amended so to provide. Under the law as it stands, however, I cannot agree with the majority that equitable subrogation should be completely unavailable in the letter of credit context.
 
 II. SUBROGATION IN THIS CASE
 A. Adequacy of a Remedy at Law
 
 79
 After Dauphin Deposit paid on the township's draft upon the letter of credit, it was statutorily and contractually entitled to immediate reimbursement from Associates. See 13 Pa.Cons.Stat.Ann. § 5114(c) (equivalent to U.C.C. § 5-114(c)). Dauphin Deposit was also, however, contractually entitled not only to a substantial annual fee for its services, which included taking some risk of nonreimbursement, but also to an assignment of a security interest in the Wausau bonds. Dauphin Deposit also received a collateral note from Tudor, Associates' general partner. The only apparent reason for this suit is that those legal remedies may not suffice to make Dauphin Deposit whole.[5]
 
 
 80
 The majority suggests that Dauphin Deposit's legal remedies against possibly assetless Tudor and Associates are "adequate," precluding equitable relief. It cites Willing v. Mazzocone, 482 Pa. 377, 393 A.2d 1155, 1158 (1978), and Chartiers Valley School District v. Virginia Mansions Apartments, 340 Pa.Super. 285, 489 A.2d 1381, 1386-87 (1985), which hold in nonsubrogation contexts that the adequacy of a legal remedy is measured by its availability, not its likelihood of success, and, concomitantly, that a defendant's insolvency does not justify equitable intervention.[6]
 
 
 81
 I find those cases distinguishable. Notably, Investors and the majority cite no case nor have I found any case from Pennsylvania or any other state that denies equitable subrogation (as opposed to injunctive or other equitable relief) on the ground of adequate remedies at law.[7] The majority's conclusion also produces an anomaly. It denies equitable subrogation when the owing party is judgment-proof, yet that is precisely when subrogation is most likely to be necessary. Consider, too, a contract between a principal and its surety. If the principal has assets, its creditor is unlikely to have to call upon the surety for payment. Moreover, under Pennsylvania law a surety always has a contract action (express or implied) against its principal for indemnity, yet it is ordinarily entitled to subrogation as well. See generally 35 Pennsylvania Law Encyclopedia, Suretyship §§ 131-134 (West, 1961 & 1991 Supp.).
 
 
 82
 Thus, the nominal availability of legal action against Tudor and Associates should not bar Dauphin Deposit from seeking subrogation to the rights of Associates. At most, the availability of superior remedies should be a subject for the district court on remand as part of the equitable balance.[8]
 
 B. The Balance of Equities
 
 83
 The relevant equities are those between Dauphin Deposit and the remaining claimant to the USF & G bonds, Investors. I have already discussed the mixed equities in favor of Dauphin Deposit. The parties also dispute the equities as to Investors. Investors claims that it is an innocent assignee with no reason to expect that its assignment rights would be subject to the subrogation claim of Dauphin Deposit. Dauphin Deposit counters that Investors was not a good faith assignee for value, but the successor and affiliate of a foreclosing creditor, Summit. According to Dauphin Deposit, Investors knew of Dauphin Deposit's role from its participation at meetings with the township and is benefiting from the windfall of improvements financed by the draft on Dauphin Deposit's letter of credit.
 
 
 84
 I have no idea which version is the more accurate or whose story is more compelling. Because this balancing of the equities is quintessentially a matter for a trial court, and the district court has not undertaken this task, I would remand the issue.
 
 C. Scope of the USF & G Bonds
 
 85
 Finally, the parties dispute whether the USF & G Bonds even covered the work that led to the default that required Dauphin Deposit to pay on the letter of credit. Investors argues that the USF & G bonds covered construction of buildings, not the site improvements that were the subject of Dauphin Deposit's letter of credit. Dauphin Deposit contends that the USF & G bonds covered the entire project, both buildings and site improvements. The district court and the majority never reached this issue, although Judge Garth, in concurring footnote 4 to the majority opinion, agrees with Investors.
 
 
 86
 This question involves contractual construction that is not simple: the Susquehanna Construction agreement is complex and probably ambiguous, and hearing parol evidence and evidence of the parties' course of conduct may prove necessary. Simply because the Wausau bonds covered only site improvements, it does not necessarily follow that the USF & G bonds were entirely complementary and covered only buildings. Moreover, Dauphin Deposit argues that Associates is estopped to deny that the USF & G bonds covered the site improvements. Because the district court did not reach these issues, I would remand them, too.
 
 III. CONCLUSION
 
 87
 For the foregoing reasons, I would reverse the judgment of the district court and remand for further proceedings.
 
 
 
 [1]
 The district court granted judgment on the pleadings against York. 768 F.Supp. 493. York did not appeal from that determination and thus is not a party to this appeal
 
 
 [2]
 The UCC also makes clear that the obligation of the issuer to its customer does not include any liability or responsibility for performance of the underlying contract unless the parties agree otherwise. 13 Pa.Cons.Stat.Ann. § 5109(a)(1). As stated in the commentary accompanying section 5109, this provision of the UCC "rests on the assumptions that the issuer has had no control over the making of the underlying contract or over the selection of the beneficiary, and that the issuer receives compensation for a payment service rather than for a guaranty of performance."
 
 
 [3]
 It should be noted that no court has considered the precise question before us, namely whether an issuing bank has the right to proceed against its customer on a subrogation theory. The more typical case involves an issuing bank asserting a subrogation interest in the beneficiary's rights against the customer. As the district court noted, the substitution of the customer for the beneficiary does not require a different analysis or result
 
 
 [4]
 Judge Garth would add to the majority's analysis:
 Moreover, when Dauphin paid the letter of credit covering site improvements, it could not, and did not, acquire subrogation rights against the USF & G bonds, which contrary to Dauphin's claims, covered the construction of the buildings and not the site improvements.
 The Supreme Court has stated that "it is elementary that one cannot acquire by subrogation what another whose rights he claims, did not have." United States v. Munsey Trust Co., 332 U.S. 234, 242, 67 S.Ct. 1599, 1603, 91 L.Ed. 2022 (1947). Dauphin acknowledged in Dauphin Deposit Bank & Trust v. Employers Insurance of Wausau, Consolidated Cases Nos. 4099 S 1988 and 5062 S 1988 (C.P. Dauphin County, Pa.) that the Wausau bonds issued in connection with ECU's contract responsibilities covered only the site improvements. (A367).
 Because Dauphin's letter of credit covered site improvements only while the USF & G bonds covered only specific buildings, Dauphin, even if otherwise eligible for equitable subrogation in the context of a letter of credit (which we hold it was not), cannot be subrogated to Associates' interest in the fund created by the proceeds of bonds issued by USF & G. This result must follow because Dauphin's letter of credit did not relate to the work covered by the USF & G bonds, which, as stated, pertained solely to building improvements. See App. at 76 and 79.
 
 
 [1]
 On the confusion engendered by the unhelpful "primary"-"secondary" dichotomy, see also Boris Kozolchyk, The Emerging Law of Standby Letter of Credit and Bank Guarantees, 24 Ariz.L.Rev. 319, 321 n. 9 (1982)
 
 
 [2]
 The majority appears to recognize this, for it concedes that "the vitality of the independence principle is unlikely to be substantially diminished were we to allow subrogation in this situation." Majority op. at 363
 
 
 [3]
 I discuss below incentives regarding the issuance of letters of credit in the first place
 
 
 [4]
 Furthermore, if offered to support a per se rule against equitable (as opposed to contractual) subrogation, the argument is somewhat circular. As I am about to discuss, an issuer of a letter of credit might have elected not to contract for specific protection in the belief (ill-advised, in light of the majority's holding) that general principles of subrogation will provide broader protection than any particular security could provide. I must concede, however, that this argument is unavailable on the facts of this case because Dauphin Deposit did contract for specific security
 
 
 [5]
 Associates and Tudor may be judgment-proof. Dauphin Deposit apparently has an action pending in Pennsylvania court against Associates, but it is unresolved. It is less clear why Dauphin Deposit's interest in the Wausau bonds is insufficient. Dauphin Deposit apparently did not perfect its security interest in the Wausau bonds, but at all events Jacobs v. Northeastern Corp., 416 Pa. 417, 206 A.2d 49, 54-55 (1965), holds that a failure to file financing statements on bonds does not bar subrogation
 
 
 [6]
 The Pennsylvania rule appears to be the minority rule, widely criticized by commentators. But, of course, however questionable that rule may be in general, it is not questionable by this court applying Pennsylvania law in a diversity case
 
 
 [7]
 In Willing, lawyers sought an injunction against a former client to prevent her from picketing their office with an allegedly defamatory sign. The Pennsylvania Supreme Court primarily ruled that the injunction ordered by the lower courts was an impermissible prior restraint on speech. In so doing, however, it also rejected the Superior Court's conclusion that an injunction was necessary because an action for damages would be pointless because the defendant was indigent
 In Chartiers Valley School District, the plaintiffs, a school district and a township, sought to impose a constructive trust on property, to rescind conveyances of that property, and to enjoin further transfers of it. The court noted that the underlying action was in fact legal, for the suit was an effort to ensure collection of taxes by preserving the taxpayer's assets.
 Neither case has anything to do with subrogation, nor do the hoary cases that they cite.
 
 
 [8]
 If the argument is instead that equitable remedies should not supplement presumptively exclusive statutory remedies, then the argument fails because the issuer's remedy under 13 Pa.Cons.Stat.Ann. § 5114(c) was not intended to rule out subrogation in a "proper" case. See 13 Pa.Cons.Stat.Ann. § 5109 comment 1